**William G. PETUSKEY, Robert A. Bullough, Clinton M. Black and Farrol R. Lambert, Plaintiffs,**

**v.**

**Calvin L. RAMPTON, as Governor of the State of Utah, Clyde L. Miller, as Secretary of State of the State of Utah, Sharp M. Larsen, as Auditor of the State of Utah, Linn C. Baker, as Treasurer of the State of Utah, Phil L. Hansen, as Attorney General of the State of Utah, Jacob A. Weiler, as County Clerk of the County of Salt Lake, State of Utah, John Preston Creer, as County Commissioner of Salt Lake County, State of Utah, William G. Larsen, as County Commissioner of Salt Lake County, State of Utah, and Marvin G. Jenson, as County Commissioner of Salt Lake County, State of Utah, Defendants.**

Civ. No. C7–63.

United States District Court
D. Utah,
Central Division.

July 3, 1965.

John S. Boyden, Salt Lake City, Utah, for plaintiffs.

Phil L. Hansen, Atty. Gen. of State of Utah, and Ronald N. Boyce, Chief Asst. Atty. Gen., of State of Utah, for defendants Calvin L. Rampton, Clyde L. Miller, Sharp N. Larsen, Linn C. Baker and Phil L. Hansen.

Grover A. Giles, Salt Lake County Atty., for defendants Jacob Weiler, Wiliam G. Larsen, John Preston Creer and Marvin G. Jenson.

Before LEWIS, Circuit Judge, and RITTER and CHRISTENSEN, District Judges

RITTER, District Judge.

This proceeding [1] is brought to invoke jurisdiction retained by this court September 12, 1964 [2] to grant injunctive and affirmative relief should the legislature fail, refuse or be unable to reapportion validly.

The Utah State Legislature, in regular session for the year 1965, enacted a bill, effective May 11, 1965, providing for re-districting the State, and more nearly equal representation in the Legislature on a population basis. (Appendix "A") [3]

This action of the Legislature is historic. No other Legislature since statehood has constructed legislative districts in both houses so nearly equal in population. This is the end of a long history of frustrated attempts to reapportion, and the beginning of a new era.

The significance of the Legislature's action is demonstrated forcefully by a few statistics:

1. In an election for state senator under the 1963 Act, one person was given 5½ times the voting power of another person merely because he lived in a rural area. [4]

In an election for state senator under the 1965 Act, the ratio of inhabitants per senator in Weber County districts, which

1. Based upon a Second Supplemental Complaint.

2. 234 F.Supp. 960 (1964).

3. Laws of Utah 1965, Chap. 72, p. 205.

4. Contrast district three, Rich, Morgan & Summit, and district eighteen, Washington County, with the Weber and Salt Lake County districts.

are the highest, to the Carbon County district, which is the lowest, is 1.74 to 1. This is dangerously close to giving a person in Carbon County twice the voting power of a person in a Weber County district. But it is a lot better than 5½ times the voting power.

2. In an election for state representative under the 1963 Act, one person was given 18 times the voting power of another person merely because he lived in a rural area or in the smallest county.[5]

In an election for state representative under the 1965 Act, the ratio of inhabitants per representative between Weber County districts, which are again the highest, and the Tooele County district, which is the lowest, is 1.55 to 1.

This is a little worse than 1½ to 1. But, again is a far cry from 18 times.

The new statute provides that the State Senate shall consist of 28 members, and that the State House of Representatives shall consist of 69 members.

In a Senate of 28 seats, Salt Lake, Weber, Utah and Davis have 19 seats; the rest of the State, 9.

In a House of 69 seats, Salt Lake, Weber, Utah and Davis have 49 seats; the rest of the State, 20.

Salt Lake County with 11 seats, plus either Weber or Utah, each with 3 seats, and any other one district would constitute a majority of the Senate.

Salt Lake County, with 28 seats, and either Weber or Utah, each with 8 seats, would constitute a majority of the House.

It could not been easy for some of the legislators to bring themselves to vote for this measure. There were strong currents of opposition in the Legislature. But the differences were composed through reason and obedience to law. And this action adds lustre to the American tradition of a free people making fundamental changes through reason and discussion and without violence.

This difficult problem in state and federal relationships could be, and in some states has been an explosive one. But not here.

And, it is no reflection upon the members of the Legislature that this difficult and complex matter requires some further action by the court.

Broadly speaking, the Legislature was confronted with finding solutions to two problems: 1. To redistrict the State to conform to the constitutional mandate "one person, one vote". 2. To work out a practicable and constitutional plan for the transition from the old malapportioned legislature to the new constitutional one.

I

REDISTRICTING THE STATE

Senatorial and representative districts are designated and defined in the Act except where counties are entitled to more than one senator or more than one representative. To take care of this *within* county districting, provision is made for the appointment of county apportionment committees.

Senatorial districts average 31,808 inhabitants, and representative districts average 12,908. Until apportionment committees in counties entitled to more than one senator or representative complete the *within* county redistricting, we can test the validity of senatorial apportionments only through the use of average population figures in Salt Lake, Weber, Utah, Davis, Cache, Box Elder, Carbon and Tooele Counties. We have actual population figures[6] for all districts other than those in the multi-district counties listed.

The highest number of inhabitants for each State Senator is the average figure of 36,915 for each of the three Weber County Senators. The lowest number per State Senator is in Carbon County, where one senator will represent 21,135 inhabitants in that district.

Weber County districts also furnish the highest average figure for House member representation—13,843. Tooele,

5. Contrast district fifteen, Carbon County, with district 29, Daggett County.

6. All population figures are based upon the 1960 census.

with a population of 17,868, and two representative districts, has the lowest average representation figure of 8,934.

Weber is the most under represented County in both the Senate and the House. (Appendix "B") The ratio of inhabitants per senator in Weber to that in Carbon County is 1.74 to 1. As we have said, this is dangerously close to twice as much voting power in the Carbon senator than in each of the Weber senators. The ratios of the most under represented counties are:

### SENATE

Weber ....................1.74 to 1
Cache ....................1.69 to 1
Utah .....................1.68 to 1
Salt Lake ................1.64 to 1
Davis ....................1.53 to 1

These represent the five highest ratios in the Senate.

### HOUSE

Weber ....................1.55 to 1
Salt Lake ................1.53 to 1
Utah .....................1.50 to 1
Davis ....................1.45 to 1
Cache ....................1.33 to 1

The first three of these ratios are the highest in the House.

These figures prompted an analysis and testing of the legislative redistricting against the United States Supreme Court standard. It would be ungenerous not to say that what the Legislature itself has done represents a surprisingly long step forward. But, the high court has said, the "Equal Protection Clause requires that a state make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable."[7]

■ The court's mandate is not expressed in precisely measured terms. The principle is laid down broadly to construct districts as nearly of equal population "as is practicable."

We think that means that the Legislature should do the best job it can on the basis of representation by population. And, that calls for some good old-fashioned common sense.

It is true that the disparities in Weber, Cache, Utah, Salt Lake and Davis, in the Senate, and Weber, Salt Lake and Utah, in the House are "greater than fifty per cent of the norm" and thus "subject to close judicial scrutiny and may be shown to be a result of factors other than substantial equality of population and therefore impermissible," as this court said in 234 F.Supp. 960, 965.

There is some dilution in the weight given votes but as was stated in Reynolds v. Sims, supra, "It is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters." The court said, "Mathematical exactness or precision is hardly a workable constitutional requirement" and quoted Justice Holmes (Bain Peanut Co. of Texas v. Penson, 282 U.S. 499, 501, 51 S.Ct. 228, 229, 75 L.Ed. 482):

"We must remember that the machinery of government would not work if it were not allowed a little play in its joints."

There are two ways to attack the problem of bringing the disparities closer together: (1) increase the number of senators and representatives assigned to the most under represented counties; (2) rearrange the legislative scheme of districting by placing some of the small most over represented counties together in a district with sufficiently increased population.

These are the choices.

Our conclusion is that without reforming the legislative districts it would not be practicable for the court to reduce the disparities. Any changes would be likely to create worse distortion.

7. Chief Justice Warren in Reynolds v. Sims, 377 U.S. 533, at pp. 577–578, 84 S.Ct. 1362, 1390, 12 L.Ed. 506, decided June 15, 1964.

To change the districts around would result in the court doing over what the Legislature has done.

In the light of the progress the Legislature has already made, we believe that this matter should be commended to the Legislature for its further consideration.

This court has said (234 F.Supp. 960–964): "The primary duty to establish a valid representation in the legislature lies with those officers of the State of Utah charged with the enactment of its laws and does not lie with this court. Consequently, we think that the present welfare of the people of the State of Utah may best be served by withholding any immediate affirmative judicial relief in order to allow the legislature of the state to give its consideration to the complexities of apportionment * * *"

The Constitution of Utah commands the Legislature, Article IX, Sec. 2: "The Legislature shall provide by law for an enumeration of the inhabitants of the State, A.D. 1905, and every tenth year thereafter, and at the session next following such enumeration, and also at the session next following an enumeration made by the authority of the United States, shall revise and adjust the apportionment for senators and representatives on the basis of such enumeration according to ratios to be fixed by law."

The Legislature has evidenced its good faith, and we have confidence that it will give its consideration to the commands of the Constitution of the United States and of the Constitution of Utah and that the members in their solemn judgment will give further consideration to the complexities of reapportionment and will enact from time to time such laws as will bring us more into conformity with the constitutional requirements.

Again the court stays its hand and will make no changes in the districts the Legislature has constructed, nor will it change the number of seats in the Senate or in the House. However, we believe still further narrowing of the disparities is practicable and we commend to the Legislature thoughtful consideration and further study of these problems, which are not easy of solution.

## II

## TRANSITION FROM PRESENT LEGISLATURE TO THE NEW

As indicated, one cannot quarrel too much with what the Legislature has done to redistrict the State.

There are provisions in the 1965 Act, however, which do not square with federal constitutional requirements. These provisions are found in Section 2 of the Act and deal fundamentally with problems which arise during the change from the old mal-apportioned legislature to the new constitutional one.

There is a whole nest of vipers in this Section. More difficult, puzzling questions you are not likely to find. They arise out of the attempt of the legislators to continue themselves in office as long as possible, and to comply with the provision of the Utah Constitution that one-half, as nearly as possible, of the senators shall be chosen biennially.[8]

1. The new Act would continue the terms of office of 11 State Senators elected in 1964 until December 31, 1968, though they were elected under an unconstitutional statute, and, what is more, one which the Act of 1965 repealed.

The first sentence of Section 2 of the Act provides that senators shall stand for election in 1966 where there are, in one district, two or more who were elected in 1964.

The second sentence of Section 2 provides: "All other senators who were elected in 1964 shall remain in office and represent the senatorial districts in which they reside until the expiration of their respective terms of office."

So, if there is but one senator elected in 1964 in a district, or one such senator and a holdover elected in 1962, the term

---

8. Article VI, Sec. 4.

of the senator elected in 1964 would be continued until December 31, 1968, by legislative fiat.

Consistent with the second sentence of Section 2, the fourth and fifth paragraphs of Section 2 specifically list 11 senatorial districts in which no senators will be elected until the November, 1968, general election. Those districts are the following:

| DISTRICTS | COUNTIES |
|---|---|
| 2, 3 & 5 | Salt Lake County |
| 12 | Weber County |
| 18 & 19 | Davis County |
| 20 | Box Elder County |
| 22 | Morgan, Rich, Summit, Duchesne & Wasatch Counties |
| 23 | Carbon County |
| 24 | Emery, Grand, Daggett & Uintah Counties |
| 25 | Juab & Tooele Counties |

In new districts 2, 3, 5 (Salt Lake County), 12 (Weber County), 18 and 19 (Davis County), 20 (Box Elder County), and 23 (Carbon County), there would be no significant changes in the areas represented by the senators elected in 1964, but the senators would be continued in office until December 31, 1968, though, we repeat, they were elected under an unconstitutional statute, and one which the Act of 1965 repealed.

2. Some new senatorial and representative districts in multi-district counties, would be left without representation until after the November, 1966 election. For instance, Salt Lake County has 11 new senatorial districts, but only 6 senators (the new Act abolished the office of one senator who was elected at large in Salt Lake County). The county has 28 representative districts but only 24 elected representatives. Other examples are:

| COUNTIES | NUMBER OF NEW DISTRICTS | NUMBER OF ELECTED SENATORS AND REPRESENTATIVES |
|---|---|---|
| Weber | 3 Senatorial | 2 Senators |
| Weber | 8 Representative | 7 Representatives |
| Utah | 3 Senatorial | 2 Senators |
| Utah | 8 Representative | 7 Representatives |
| Davis | 5 Representative | 4 Representatives |
| Cache | 3 Representative | 2 Representatives |
| Carbon | 2 Representative | 1 Representative |
| Tooele | 2 Representative | 1 Representative |

3. In five representative districts which, in each instance, were formed by the combining of two counties, there would be two representatives instead of one for each district. These would be districts 60 (Duchesne and Wasatch), 61 (Daggett and Uintah,) 62 (Juab and Millard), 64 (Emery and Grand), and 69 (Kane and Washington). In one new district, 59 (Morgan, Rich and Summit)

there would be 3 representatives instead of one, and in new district 67 (Beaver, Garfield, Piute and Wayne), there would be four representatives until December 31, 1966.

4. Emery County would be without voter representation in the state senate for four and one-half years, from May 11, 1965 (the effective date of the Act) until the Legislature meets in January 1969.

Emery County formerly was in old district 10. In 1964 Senator Vernon L. Holman was elected for a 4-year term in that district. Emery County is now in new district 24, which is made up of Emery, Grand, Daggett and Uintah Counties. Senator Holman resides in Garfield County, which is outside of this new district, consequently he would no longer represent the inhabitants of Emery County. Senator Samuel J. Taylor was elected in 1962 from the Counties of Grand and San Juan. His term expires December 31, 1966. He is a resident of the new district, his home being in Grand County. Senator Leland Sowards was elected in 1964 from old district 16, which was made up of Daggett and Uintah Counties, to which Emery and Grand have been added to form new district 24. Under the new Act the inhabitants of Emery County would lose representation by Senator Holman. Until December 31, 1966, they would be represented by Senators Taylor and Sowards, for whom they have had no opportunity to vote. From the end of 1966 until December 31, 1968, they would be represented by Senator Sowards. The inhabitants of Emery County would not be given an opportunity to vote for new senatorial representation at the general election in 1966. So, from May 11, 1965 (the effective date of the Act) until the Legislature meets in January 1969, Emery County residents would not have voter representation in the State Senate.

5. Grand County would be without voter representation for two years from 1966 to 1968.

The inhabitants of Grand County would be represented until December 31, 1966, by Senators Taylor and Sowards, and thereafter until December 31, 1968, by Senator Sowards. The inhabitants of Grand County participated in the election of Senator Taylor in 1962, but upon the expiration of his term at the end of 1966, they would not have an opportunity to vote for senatorial representation until the general election in 1968. By legislative fiat, they would be represented by Senator Sowards, who did not stand for election from Grand County. It should be pointed out that Senator Taylor, who was elected in 1962 from Grand and San Juan Counties, would lose San Juan County from the area he was elected to represent, and would gain the Counties of Emery, Daggett and Uintah for the balance of his term.

6. Morgan, Rich and Summit Counties would be without voter representation for two years from 1966 to 1968.

Senator John A. Lambert was elected in 1962 to represent the Counties of Morgan, Rich and Summit. His term expires December 31, 1966. In forming new district 22, Morgan, Rich and Summit were added to Duchesne and Wasatch. Senator Gordon E. Harmston, in 1964, was elected to represent Duchesne and Wasatch. Both senators reside in new district 22, and the inhabitants of that district would be represented by them until December 31, 1966. The inhabitants of Morgan, Rich and Summit Counties would not have an opportunity to vote for senatorial representation in the 1966 general election, but would be represented until December 31, 1968, by Senator Harmston.

It is manifest this situation is monstrous, in a small way. It is wholly lacking in rationality. The Legislature has set up a scheme that too long will delay constitutional reapportionment and equal representation in the Utah Legislature.

The high court has said:[9] "When a State exercises power wholly within the

9. Gomillion v. Lightfoot, 364 U.S. 339 at 347, 81 S.Ct. 125, at 130, 5 L.Ed.2d 110.

domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right."

■ The citizens of Utah have a federally protected right to a Legislature which has been apportioned in conformity to federal constitutional standards. They will not have such a Legislature until January 1969, under the 1965 Act.

Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, was decided March 26, 1962. Since that time two regular legislative sessions have been held, the sessions of 1963 and 1965.

This action was filed January 16, 1963. The line of cases stemming from Baker v. Carr, including Reynolds v. Sims, supra, were in the mill. The Legislature was upon notice all that while.

In the 1963 session the Legislature enacted a reapportionment act that was patently unconstitutional. And, in the 1965 session they have enacted one which denies the state a constitutionally apportioned Legislature until January 1969. This delay is too long.

### THE REMEDIES

The State of Utah should not be left without a Legislature. We regard our power as ample to continue the terms of the legislators in the present Legislature through the general election in November 1966, and until December 31, 1966. To say the least, the people voted for this Legislature.

All of the seats in the House of Representatives will be filled, anyway, at the general election to be held the first Tuesday after the first Monday in November 1966. One-half, as nearly as possible, of the Senate seats normally would be filled at the same time. No great dislocation will take place if the seats of all senators, as well as of all representatives, are required to be filled at that time. This

should be done in accordance with Sections 1, 3 and 4 of the Reapportionment Act of 1965, so that in the regular legislative session in January 1967 the Legislature will be a constitutionally reapportioned one.

We rely, for authority, upon the Supreme Court's statement about the proper remedial devices which federal courts should utilize in state cases.

"Remedial techniques in this new and developing area of the law will probably often differ with the circumstances of the challenged apportionment and a variety of local conditions. It is enough to say now that, once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree. As stated by Mr. Justice Douglas, concurring in Baker v. Carr, 'any relief accorded can be

fashioned in the light of well-known principles of equity.'" Reynolds v. Sims, supra, at page 585, 84 S.Ct. at pages 1393, 1394.

The first general election in this State will be held in November 1966. Redistricting *within* counties under Section 4 of the 1965 Act can hardly be expected to be completed in time for a special election at the time of our municipal elections in November, 1965. And, there are some counties in which there will be no municipal elections this fall. While bringing the Legislature into its properly apportioned course should not be unduly delayed, it seems to us to be rushing matters a bit too fast to require a special election of the Legislature in November 1965. And to hold a special election then would put the taxpayers to considerable additional expense.

If the Legislature, at its 1965 session, had really wanted to effect an early constitutional reapportionment it would have been a simple matter to set up the machinery for a statewide special election of the legislators in November 1965, staggered senate terms and all. But Utah's Legislatures have never shown any enthusiasm for reapportionment on the basis of population. This one was no exception, and this is not because of any political partisanship.

This court found it necessary to say, 234 F.Supp. 960 (1964) at page 964, Note 6:

"We note here the somewhat widespread public statements of some persons who are, or may be, charged with the responsibility of lawmaking that reapportionment is a subject upon which they are 'willing to drag their feet' or to 'await potential changes in the federal law or Constitution.' It is sufficient to say

that the denial of the equal protection of law to the citizens of Utah is not a situation that can tolerate a 'dragging of feet,' for to suspend a constitutional right by delay is to deny that right. Similarly, it is the duty of the legislature as well as the duty of this court to approach the problem of apportionment under existing law."

It is manifest in the 1965 Act that the legislators sought to continue themselves in office until the end of their elected terms, eleven senators until December 31, 1968. And this, in face of the fact that the acts under which they had been elected had been held unconstitutional and moreover were repealed by them. For a very long period of time all efforts to obtain a constitutionally apportioned Legislature in this State have been frustrated. There is now a further unfortunate delay until January 1967 before we shall have a constitutionally apportioned Legislature.[10]

Nothing we do today is to be interpreted as authorizing the Legislature at any session prior to January 1967 to pass any further reapportionment legislation except to stagger the terms of the senators in accordance with the State Constitution of Utah. And particularly, nothing we do today is to be interpreted as authorizing legislative action with respect to any amendment which may be proposed to the Constitution of the United States to permit apportionment including factors other than population.

We do not assume that the Legislature would act unconstitutionally and in defiance of the mandates of the Supreme Court of the United States and of this court if they should be called into session prior to January 1, 1967. Hence, again, we stay our hand and do not now give injunctive and affirmative relief for we

---

10. It is interesting to note the speed by which the last State Legislature memoralized Congress (S.J.R. #5) to call a constitutional convention to provide for reapportionment "on factors other than population", which resolutions the State

Senate passed on the tenth day of the session, compared to the Legislature's hesitancy to properly reapportion under the mandate of this court, which action occurred on the final (sixtieth) day of the session.

think that the present welfare of the people of the State of Utah may thus best be served. Should the Legislature, between now and January 1, 1967, attempt to reapportion unconstitutionally or attempt to ratify any proposed amendment to the Constitution of the United States to apportion one or both houses of the Legislature on factors other than population, it will be this court's duty to give further consideration to the necessity of giving plaintiffs injunctive and affirmative relief by judicial decree, and for such purpose we again retain jurisdiction.

The Governor may or may not call a special session, and may or may not place apportionment upon its agenda. Having regard to the long period of time during which all efforts to obtain a constitutionally apportioned Legislature have been frustrated in this State, and to the further unfortunate delay until January 1967 before we shall have a constitutionally apportioned Legislature, well-known general principles of equity require that the Legislature not consider or vote upon any proposal to amend the Constitution of the United States on the subject of legislative reapportionment, and require that the Legislature not take any action on the subject of legislative apportionment except to stagger the terms of senators to provide continuity.

If a special session of the Legislature should be called prior to January of 1967, and if the Governor should place the subject upon its agenda, the Legislature may wish to make provision for staggering the terms of senators to conform to Article VI, Section 4 of the Utah Constitution. It would be desirable to do this as early as possible, and nothing the court has said is intended to prevent the Legislature from taking such action at such special session if there should be one.

▇▇▇ Every common sense consideration argues that remedial measures be taken at the earliest practicable time. To that end, we hold:

1. That Section 2 of the Reapportionment Act of 1965 violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

2. That all 28 members of the Utah Senate, as well as all 69 members of the House of Representatives, shall be elected at the first general election, on the first Tuesday after the first Monday in November, 1966, for two year terms of office only, unless the Legislature has staggered the terms of senators.

3. That the members of the Utah Senate and House of Representatives shall be elected in November, 1966, from the districts newly constructed under the Reapportionment Act of 1965.

4. That the terms of office of the senators and representatives in the present Legislature shall be continued until December 31, 1966, to assure the State a Legislature at all times during this transition period; and that the terms of office of all such senators and representatives shall expire and become vacated at that time, notwithstanding any provision to the contrary in the Reapportionment Act of 1965.

5. That the Legislature may, if it should wish to do so, stagger the terms of senators to conform to the Utah Constitution at any special session held before December 31, 1966, and, in any event, should do so not later than the regular session in 1967.

6. That the Legislature which shall meet in regular session in January, 1967, shall be composed of representation from the senatorial and representative districts constructed pursuant to the provisions of the Reapportionment Act of 1965 for a senate of 28 and a house of 69 seats.

7. That the judgment of this court as reflected in 1, 2, 3, 4, 5 and 6, supra, shall be a final judgment and as such subject to immediate review at the instance of the parties.

8. That jurisdiction of the case in all other aspects including that to grant injunctive and affirmative relief to plaintiffs, is retained by this court.

A decree will be entered accordingly.

APPENDIX "A"

H.B. No. 8

By Messrs. McKay, Harding, Hamilton, and Mrs. Vance.

AN ACT PROVIDING FOR REPRESENTATION IN THE LEGISLATURE OF THE STATE OF UTAH; PROVIDING FOR A REAPPORTIONMENT OF THE LEGISLATURE; CREATING SENATORIAL AND REPRESENTATIVE DISTRICTS; PROVIDING FOR THE ELECTION OF SENATORS AND REPRESENTATIVES; DESIGNATING SENATORIAL AND REPRESENTATIVE DISTRICTS OF THE STATE OF UTAH; PROVIDING FOR DISTRICTS IN COUNTIES HAVING MORE THAN ONE SENATOR OR REPRESENTATIVE; AND REPEALING SECTIONS 36–1–1, AND 36–1–2, UTAH CODE ANNOTATED 1953, AS AMENDED BY CHAPTER 61, LAWS OF UTAH 1955, AS AMENDED BY CHAPTER 54, LAWS OF UTAH 1963, AND SECTION 36–1–4, UTAH CODE ANNOTATED 1953, AS AMENDED BY CHAPTER 60, LAWS OF UTAH 1953, AS AMENDED BY CHAPTER 61, LAWS OF UTAH 1955, AS AMENDED BY CHAPTER 54, LAWS OF UTAH 1963.

Be is enacted by the Legislature of the State of Utah:

Section 1. The senate of this state shall consist of 28 members, with one member to be elected from each senatorial district. No senator shall be elected at large in a county which has more than one senatorial district. The numbers, boundaries and representation of such senatorial districts are hereby designated and established as follows:

Districts One through Eleven, inclusive: Salt Lake City—eleven senators

Districts Twelve, Thirteen and Fourteen: Weber County—three senators

Districts Fifteen, Sixteen and Seventeen: Utah County—three senators

Districts Eighteen and Nineteen: Davis County—two senators

District Twenty: Box Elder County—one senator

District Twenty-one: Cache County—one senator

District Twenty-two: Morgan, Rich, Summit, Duchesne and Wasatch Counties—one senator

District Twenty-three: Carbon County—one senator

District Twenty-four: Emery, Grand, Daggett and Uintah Counties—one senator

District Twenty-five: Juab and Tooele Counties—one senator

District Twenty-six: Millard, Sanpete and Beaver Counties—one senator

District Twenty-seven: Iron, Kane and Washington Counties—one senator

District Twenty-eight: Sevier, Wayne, Piute, Garfield and San Juan Counties—one senator

Section 2. If, as a result of redistricting by this act, two or more senators who were elected in 1964 shall reside in one senatorial district the terms of such senators shall expire December 31, 1966. All other senators who were elected in 1964 shall remain in office and represent the senatorial districts in which they reside until the expiration of their respective terms of office. Whenever possible the apportionment committee provided for in section 4 shall designate and number senatorial districts within a county so as to avoid including in any senatorial district more than one senator who was elected in 1964.

Senators shall be elected from senatorial districts 1, 4, 6, 8, .9, 10, 13, 14, 15, 16, 21, 26, 27 and 28 at the general election to be held in 1966 for a four year term, and every four years thereafter.

Senators shall be elected from senatorial districts 7, 11, and 17, at the general election to be held in 1966 for a two year term, and at the general election to be held in 1968 for a four year term, and every four years thereafter.

Senators shall be elected from senatorial districts 2, 3, 5, 12, 19, 20, 22, 23, 24 and 25 at the general election to be held in 1968 for a four year term, and every four years thereafter.

A senator shall be elected from senatorial district 18 at the general election to be held in 1968 for a two year term, and at the general election to be held in 1970 for a four year term, and every four years thereafter.

Section 3. The house of representatives of this state shall consist of 69 members, with one member to be elected from each representative district. No representative shall be elected at large in a county which has more than one representative district. The numbers, boundaries and representation of such representative districts are hereby designated and established as follows:

Districts One through Twenty-eight, inclusive: Salt Lake County—twenty-eight representatives.

Districts Twenty-nine through Thirty-six, inclusive: Weber County—eight representatives.

Districts Thirty-seven through Forty-four, inclusive: Utah County—eight representatives.

Districts Forty-five through Forty-nine, inclusive: Davis County—five representatives.

Districts Fifty, Fifty-one and Fifty-two: Cache County—three representatives

Districts Fifty-three and Fifty-four: Box Elder County—two representatives

Districts Fifty-five and Fifty-six: Carbon County—two representatives

Districts Fifty-seven and Fifty-eight: Tooele County—two representatives

District Fifty-nine: Morgan, Rich and Summit Counties—one representative

District Sixty: Duchesne and Wasatch Counties—one representative

District Sixty-one: Daggett and Uintah Counties—one representative

District Sixty-two: Juab and Millard Counties—one representative

District Sixty-three: Sanpete County—one representative

District Sixty-four: Emery and Grand Counties—one representative

District Sixty-five: Sevier County—one representative

District Sixty-six: San Juan County—one representative

District Sixty-seven: Beaver, Garfield, Piute and Wayne Counties—one representative

District Sixty-eight: Iron County—one representative

District Sixty-nine: Kane and Washington Counties—one representative

Section 4. An apportionment committee shall be appointed in each county which is entitled to more than one senator as provided in section 1 of this act and/or which is entitled to more than one representative as provided in section 3 of this act. The committee shall consist of five electors of the county who are not elected or appointed officers or employees of the state, city, county, school district

or other political subdivision, except that members of the state legislature may serve on the committee. Two members of the committee shall be appointed by the county Democratic party executive committee, one of whom shall be a member of the state legislature and a resident of the county, two members of the committee shall be appointed by the county Republican party executive committee, one of whom shall be a member of the state legislature and a resident of the county, and one member shall be elected by a majority vote of the other four members. In the event a member of the state legislature is not available by party and by residence, the committee appointment shall be made from other county electors. The appointment of such committee members by the political party executive committees shall be made within thirty days after the effective date of this act and the county clerks in the respective counties shall be notified of such appointments. The county clerk shall immediately call a meeting of the appointed members of the committee, at which meeting the fifth member shall be elected. If appointment of members authorized to be made by the political parties is not made by July 1, 1965, the chairman of the board of county commissioners shall appoint two members from the Democratic party and two members from the Republican party to serve as members of the committee, provided that, if either party shall have appointed committee members, the chairman of said board shall appoint only two members from the political party which has not made the appointment.

If the four committee members have not been able to agree upon the fifth member within ten days after their appointment the chairman of the board of county commissioners shall immediately call the four committee members into a meeting and the two Democratic members shall select a person and the two Republican members shall select a person and the chairman of the board shall draw lots to determine which of the persons thus selected shall be the fifth member of the committee. Within fifteen days after the election or selection of the fifth member of the committee the county clerk shall call a meeting of the committee for the purpose of electing a chairman and the committee shall then proceed as expeditiously as possible to discharge its duties. The committee shall determine and designate which voting districts shall make up the senatorial and/or representative districts in the county. Such determination shall be based as nearly as possible upon the actual population in each voting district to insure that the senatorial districts are as nearly equal as possible in population and that the representative districts are as nearly equal as possible in population. Representative districts may be divided in the formation of senatorial districts. All voting districts in a senatorial or representative district shall be contiguous. The committee shall use the last available official federal census to determine the population and may use voter registration lists, school census data and other data which will help to determine actual population in each voting district. The committee shall be provided with any information it may request from the office of the county clerk and shall have access to any public records or documents which may be helpful to it in determining population figures. When the committee has completed the designation of senatorial and representative districts it shall furnish a copy thereof to the board of county commissioners. The clerk of said board shall then prepare and certify a map of such senatorial and representative districts and file it with the secretary of state on or before January 1, 1966.

Section 5. Should the Constitution of the United States be amended to allow the legislatures of the states to be apportioned in any house or both on factors other than population, the governor shall, within 60 days from the effective date of such an amendment, appoint a committee to study and recommend a plan for the apportionment of the legislature or any house thereof on factors other than population. The committee shall consist of nine members: four members shall

be republicans consisting of two senators and two members of the house of representatives; four members shall be democrats consisting of two senators and two members of the house of representatives; the ninth member shall be a citizen over the age of 21 years who is a registered voter in a voting district where he resides. The governor shall endeavor to appoint members to the committee who are representative of the population, ethnic, economic and geographical interests of the state.

Section 6. Sections 36–1–1 and 36–1–2, Utah Code Annotated 1953, as amended by chapter 61, Laws of Utah 1955, as amended by chapter 54, Laws of Utah 1963, and Section 36–1–4, Utah Code Annotated 1953, as amended by chapter 60, Laws of Utah 1953, as amended by chapter 61, Laws of Utah 1955, as amended by chapter 54, Laws of Utah 1963, are hereby repealed.

APPENDIX "B"

STATE SENATE

| Districts | Counties | Population | Average or Actual Population Per Seat | Ratio | Number of Senators |
|---|---|---|---|---|---|
| 1–11 | Salt Lake | 383,035 | 34,821 | 1.64 to 1 | 11 |
| 12–13–14 | Weber | 110,744 | 36,915 | 1.74 to 1 | 3 |
| 15–16–17 | Utah | 106,991 | 35,664 | 1.68 to 1 | 3 |
| 18–19 | Davis | 64,760 | 32,380 | 1.53 to 1 | 2 |
| 20 | Box Elder | 25,061 | 25,061 | 1.18 to 1 | 1 |
| 21 | Cache | 35,788 | 35,788 | 1.69 to 1 | 1 |
| 22 | Morgan, Rich, Duchesne, Summit, Wasatch | 22,682 | 22,682 | 1.07 to 1 | 1 |
| 23 | Carbon | 21,135 | 21,135 | 1 to 1 | 1 |
| 24 | Emery, Grand, Daggett, Uintah | 24,637 | 24,637 | 1.16 to 1 | 1 |
| 25 | Juab, Tooele | 22,465 | 22,465 | 1.06 to 1 | 1 |
| 26 | Millard, Sanpete, Beaver | 23,250 | 23,250 | 1.10 to 1 | 1 |
| 27 | Iron, Kane, Washington | 23,733 | 23,733 | 1.12 to 1 | 1 |
| 28 | Sevier, Wayne, Piute, Garfield, San Juan | 26,346 | 26,346 | 1.24 to 1 | 1 |

HOUSE OF REPRESENTATIVES

| Districts | Counties | Population | Average or Actual Population Per Seat | Ratio | Number of Representatives |
|---|---|---|---|---|---|
| 1–28 | Salt Lake | 383,035 | 13,680 | 1.53 to 1 | 28 |
| 29–36 | Weber | 110,744 | 13,843 | 1.55 to 1 | 8 |
| 37–44 | Utah | 106,991 | 13,374 | 1.50 to 1 | 8 |
| 45–49 | Davis | 64,760 | 12,952 | 1.45 to 1 | 5 |
| 50–52 | Cache | 35,788 | 11,929 | 1.33 to 1 | 3 |
| 53–54 | Box Elder | 25,061 | 12,530 | 1.40 to 1 | 2 |
| 55–56 | Carbon | 21,135 | 10,568 | 1.18 to 1 | 2 |
| 57–58 | Tooele | 17,868 | 8,934 | 1    to 1 | 2 |
| 59 | Morgan, Rich, Summit | 10,195 | 10,195 | 1.14 to 1 | 1 |
| 60 | Duchesne, Wasatch | 12,487 | 12,487 | 1.40 to 1 | 1 |
| 61 | Daggett, Uintah | 12,746 | 12,746 | 1.42 to 1 | 1 |
| 62 | Juab, Millard | 12,463 | 12,463 | 1.40 to 1 | 1 |
| 63 | Sanpete | 11,053 | 11,053 | 1.24 to 1 | 1 |
| 64 | Emery, Grand | 11,891 | 11,891 | 1.33 to 1 | 1 |
| 65 | Sevier | 10,565 | 10,565 | 1.18 to 1 | 1 |
| 66 | San Juan | 9,040 | 9,040 | 1.01 to 1 | 1 |
| 67 | Beaver, Garfield, Piute, Wayne | 11,072 | 11,072 | 1.24 to 1 | 1 |
| 68 | Iron | 10,795 | 10,795 | 1.21 to 1 | 1 |
| 69 | Kane, Washington | 12,938 | 12,938 | 1.45 to 1 | 1 |

CHRISTENSEN, District Judge (concurring in the result, and dissenting in part).

I concur in the numbered conclusions of the prevailing opinion and with much that is said concerning the Utah Reapportionment Act of 1965, Laws of Utah 1965, Chap. 72, P. 205, and particularly Section 2 thereof. The analysis is comprehensive and convincing that the latter section cannot stand and that the corrective action taken by the court is fully justified and appropriate. I find myself, however, unable to agree with two basic aspects of the prevailing opinion which are deemed of such importance as to require a dissenting statement.

## I.

If, as is only inferred in the prevailing opinion,[1] but as I believe, the Utah Re-

1. "The citizens of Utah have a federally protected right to a Legislature which has been apportioned in conformity to federal constitutional standards. They will not have such a Legislature [without the court's corrective action in lieu of Section 2] until January 1969, under the 1965 Act * * *" (p. 372).

"In the 1963 session the Legislature enacted a reapportionment act that was patently unconstitutional. And, in the 1965 session they have enacted one which denies the state a constitutionally apportioned Legislature until January, 1969 * * *" (p. 372)

"No great dislocation will take place if the seats of all senators, as well as of all representatives, are required to be filled at that time. This should be done in accordance with Sections 1, 3 and 4 of the Reapportionment Act of 1965, so that in the regular legislative session in January 1967 the Legislature will be a constitutionally reapportioned one * * *" (p. 372).

apportionment Act of 1965 (with the court's order substituted for Section 2) involves constitutionally permissible and valid apportionment, this should have been included among the specific rulings of the court, and the precatory or advisory expressions concerning additional action to be taken by the legislature should not have been volunteered.[2]

Having in effect sustained the constitutionality of the present act as modified by us, the retention of jurisdiction not merely for the purpose of seeing that the Act passed by the legislature, as modified by our order, is carried out, but for unlimited purposes in view of the continuing advice contained in the opinion, I apprehend will be placing us in the position of holding a sword over the heads of state legislators indefinitely and without reference to any jurisdiction which we actually possess.

Practically as well as conceptually speaking, there is no such thing as "a little" unconstitutionality. In the practicalities of judgment it is the court's duty to come to a conclusion on the facts before it as to the constitutionality of a given act or course of action within the realities of the situation—and we have. That the case may be close to the line and contain the seeds for our future intervention should legislators not strengthen the Act in view of developing conditions does not relieve us of the responsibilities of judgment, and having reached that judgment, we are not invested perpetually with the powers of supervision.[3] This case sometime must come to an end and we should not, against the background of such expressions, give even the appearance of arrogating to the court the function of perpetual watchdog of the state legislature. If and when the legislature passes, or threatens to pass, further acts in conflict with the Constitution of the United States or to frustrate our dispositions as to prior acts, or there is brought to our attention by appropriate pleadings further invidious discrimination in voting power which is repugnant to the Constitution, time enough to pass upon these other situations.

## II.

Related considerations lead me to dissent from the views contained in the last three paragraphs immediately preceding the final conclusions, not because I necessarily take issue with most of them but because I consider it inappropriate to express any of them at this time. Theretofore, it was properly stated that, "We do not assume that the Legislature would act unconstitutionally and in defiance of the mandates of the Supreme Court of the United States and of this court if they should be called into session prior to January 1, 1967". Yet in effect this assumption is abandoned and it is speculated that if a special session were called, and if there were included by the Governor in the call matters which we would not consider appropriate for interim legislative action, and if the legislature pursuant to such authorization should attempt to so act, " * * * it will be this court's duty to give further consideration to the necessity of giving plaintiffs injunctive and affirmative relief by judicial decree, and for such purpose we again retain jurisdiction." What our further duty may be, if any,

2. "In the light of the progress the legislature has already made, we believe that this matter should be commended to the Legislature for its further consideration * * *" (p. 369)

"The Legislature has evidenced its good faith, and we have confidence that it will give its consideration to the commands of the Constitution of the United States and of the Constitution of Utah and that the members in their solemn judgment will give further consideration to the complexities of reapportionment and will enact from time to time such laws as will

bring us more into conformity with the constitutional requirements * * *" (p. 369).

3. As was stated in Petuskey v. Clyde, 234 F.Supp. 960, 964 (D.C.Utah 1964) "The legislature is faced with a discretionary problem limited only by the principle that apportionment must be based upon substantial equality of population with such minor deviations as 'are free from any taint of arbitrariness or discrimination' ". (Citing Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620.)

should await developments and what remedies we should consider should be indicated only when our further jurisdiction is invoked. Certainly, in view of adequate power otherwise to secure compliance we should hesitate without factual structuring of our judgment to venture into the unchartered sea of direct injunction against legislative voting which the Supreme Court itself thus far has hesitated to venture upon.[4] Federal-state relations at best are too delicate, important and fraught with opportunity for too many conflicts to thus permit our being carried, even with the best of purposes, beyond matters which have been properly presented to us and which are essential to enforce the Equal Protection Clause of the Constitution of the United States.[5] This would only serve unnecessarily to cast an indefinitely lengthening shadow over matters of peculiar state concern discordantly with the Tenth Amendment.[6]

---

4. See Fortson v. Toombs, 1965, 379 U.S. 621, 85 S.Ct. 598, 13 L.Ed. 527; Hoff et al. v. Buckley, et al., 379 U.S. 359, 85 S.Ct. 503, 13 L.Ed.2d 352 (1965).

5. Amendment XIV. "No State shall make or enforce any law which shall * * *

deny to any person within its jurisdiction the equal protection of the laws,"

6. Amendment X. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively or to the people."