William G. PETUSKEY, Robert A. Bullough, Clinton M. Black and Farrol R. Lambert, Plaintiffs,
and
Brian Florence, Petitioner in Intervention,

v.

Calvin L. RAMPTON, as Governor of the State of Utah; Clyde L. Miller, as Secretary of State of the State of Utah, Sharp M. Larsen, as Auditor of the State of Utah; Linn C. Baker, as Treasurer of the State of Utah; Phil L. Hansen, as Attorney General of the State of Utah; Jacob A. Weiler, as County Clerk of the County of Salt Lake, State of Utah; John Preston Creer, as County Commissioner of Salt Lake County, State of Utah; William G. Larsen, as County Commissioner of Salt Lake County, State of Utah, and Marvin G. Jenson, as County Commissioner of Salt Lake County, State of Utah, Defendants.

No. C 7–63.

United States District Court
D. Utah, C. D.

Aug. 6, 1969.

Final Findings, Conclusions, Judgment and Order, Oct. 10, 1969.

A. Wally Sandack, William J. Lockhart, Salt Lake City, Utah, for plaintiffs, and petitioner in intervention.

Vernon B. Romney, Atty. Gen., Salt Lake City, Utah, for defendants.

RITTER, Chief District Judge, sitting as a single judge United States District Court.

This matter stems from the adoption by the Senate and House of Representatives of Utah's 1965 unconstitutionally apportioned Legislature of a Resolution designated SJR3 which attempted to apply to the Congress of the United States to call a Constitutional Convention to provide for reapportionment of one House of a bicameral legislature on factors other than population and directed that the proper officer of this State transmit copies of the application to the Senate and House of Representatives of the United States.

At the date of filing his petition, Brian Florence alleges that thirty-three of the several states have adopted a variety of applications to the Congress requesting that Congress call a Convention for the same general purposes urged in SJR3, and that when a thirty-fourth state adopts such a Resolution, two-thirds of the several states will have made similar applications to Congress and pursuant to Article V, Constitution of the United States, the Congress " * * * shall call a Convention * * * " for that purpose.

He further alleges that the interests which petitioner shares with all other members of the class, as well as his special interests as a legislator of the State of Utah, are threatened by the imminent prospect of adoption of a similar resolution by any one of the seventeen states which have not as yet acted on such a resolution; and that there is imminent prospect of the adoption of such a resolution by the Legislature of the State of Wisconsin, as is more fully explained in the Wall Street Journal of 2 June, 1969.

Petitioner further alleges that the illegal and invalid attempt to petition Congress to call a Convention threatens to effect a fundamental constitutional change through the action of the unconstitutionally apportioned 1965 Utah Legislature, and further threatens, by such assumption of invalid authority, permanently to deprive him of the legislative voice to which he is entitled. The imminent threats posed by the unconstitutional action of the 1965 Legislature in proposing a convention call threatens to debase and dilute his vote both as a qualified voter and as a legislator in the House of Representatives of the State of Utah.

And, the Petitioner prays that: (1) he be permitted to intervene as a plaintiff on behalf of each and all other persons similarly situated who are qualified voters in the State of Utah; (2) after reasonable notice and hearing and in order to protect and effectuate its earlier Judgments in this action, this Court should enter an order declaring the action of the 1965 Utah State Legislature in adopting S.J.R. No. 3 to be illegal, invalid, and unconstitutional; (3) that this Court issue an Order mandatorily requiring Clyde L. Miller, Secretary of State of Utah, or other proper officer, to advise the Congress of the actions taken by this Court declaring the invalidity and unconstitution-

ality of S.J.R. No. 3 and requesting the withdrawal of said Resolution; (4) that this Court forthwith issue a Temporary Restraining Order mandatorily requiring Defendant Clyde L. Miller, as Secretary of State of Utah, to advise Congress that the validity of S.J.R. No. 3, adopted by the 1965 Utah State Legislature, is questioned by this action, that until the validity of said resolution is determined, his authority to submit said resolution to Congress is in doubt, and that he must require the return of said resolution, pendente lite.

There have been two judicial inquiries in depth, and two adjudications that the 1965 Legislature was unconstitutionally apportioned. One of those was before SJR3 was adopted and one after. Petuskey v. Clyde, 234 F.Supp. 960 (1964) and Petuskey v. Rampton 243 F.Supp. 365 (1965). In no uncertain terms Circuit Judge Lewis, speaking (234 F.Supp. 960) for the three-judge court which held the Reapportionment Act of 1963 "federally unconstitutional" as it pertained to the apportionment of the Utah State Senate and the Utah State House of Representatives said:

" * * * there exists a gross and untenable dilution of the weight accorded the individual votes of citizens of Utah who reside in the more populous counties and districts. The disparity between the effectiveness of citizens votes * * * is an invidious discrimination denying to the people of Utah the equal protection of its law and thus violating the compulsion of the Fourteenth Amendment to the Constitution of the United States."

Twice that Legislature has been held to be a body in which the voting power of the urban Wasatch Front counties was grossly diluted in favor of the rural, and that such disparity was a discrimination denying to the people of Utah the equal protection of the law in violation of the Fourteenth Amendment to the Constitution of the United States.

Twice this court exercised restraint to allow the Legislature to correct this discrimination, once on September 12, 1964, about four months before SJR3, and once July 12, 1965 following the 1965 session. The court on both occasions addressed itself to the long history of strong opposition in the Utah Legislature to, and its successful frustration of, attempts to reapportion on a fair voting representation.

The court on both occasions reserved jurisdiction to deal with the problem if the legislators did not. Well, instead they adopted SJR3, which is an expression of resentment, and defiance, really. That is the background of SJR3.

The present proceeding was commenced by the filing on Friday, June 6, 1969, of a "Motion To Intervene As A Plaintiff and Claim In Intervention For Additional Relief" in the case of Petuskey et al. v. Rampton et al., supra. At that time a ten-day temporary restraining order was issued, and the matter was set for hearing on Friday, June 13th, before the Chief Judge of the District Court, who, also, was a member of the three-judge court.

The hearing was held on Friday, June 13, 1969, and is summarized as follows:

The only issue the court was asked to decide was whether or not this is a case requiring a three-judge court. Counsel for intervenor and claimant said, in his view, it is a one-judge case. The Attorney General for the State of Utah said his position was that it is a three-judge case.

In answer to the court's question who must make that decision the Attorney General said, "I think it is your honor."

The court responded: "Well, that is what I think, too."

The court asked counsel to prepare written briefs on that single issue.

The Attorney General refused to agree to a temporary restraint until briefs were filed and the court asked the Attorney General "Don't you want some time within which to prepare it?" To which the Attorney General responded,

"I would prefer to have the court rule immediately, your honor, and, if your honor wants briefs, of course we are going to supply them." The court: "Well, I think that is unreasonable, that you want the court to rule before the court has an opportunity to study the evidence, to study the decisions, to read the statute, and the legislative history.

"A judge shouldn't be required to decide the serious questions we have been reviewing without any consideration, without leaving the bench, without reading the cases or your briefs. Now, I don't think that makes any sense at all.

"When the State asks me to decide those questions, instanter, without any time at all to reflect upon the evidence, or even to know what it is, or to reflect upon the law without knowing what it is yet, I think the State is asking the court to do a most injudicious thing, a most impossible thing."

THE COURT: "Very well, the restraining order is extended for ten days from the date and hour of the expiration of the previous order. You figure it out. And before that time expires, if you haven't already submitted your briefs here and I haven't already disposed of the matter, you come in and we will file your motion (for another extension of restraining order) and we will set it up on a calendar and we will hear you again. This is the way sometimes it is."

"If I conclude that this is a three-judge court case, you are going to have a three-judge court just as speedily as I can arrange it."

The restraining order plus one ten-day extension to July 26th [Rule 65(b)] was in effect when on Friday, June 20th, the Attorney General filed a "Motion To Three Judge Court", in which he moved the three-judge court to try this cause at the earliest practical time and to review the decision of June 13th extending the temporary restraining order issued on June 6, 1969.

Four days later, on Tuesday, June 24th, the Circuit Judge member of the Petuskey three-judge court noticed the matter for hearing on Friday, June 27th, before three judges, and such hearing was held.

The Circuit Judge opened the hearing by saying: "We are here this morning to hear a single motion filed by the Attorney General in C 7–63 asking this three-judge court to try the issues filed by Intervenor Brian Florence in this case and to review the action taken by Chief Judge Ritter as a single judge in this case.

"I think the court is interested in many aspects of it, but the threshold question is the right or desirability of allowing purported intevenors to intervene in this case at all at this time and to present the issues they wish to present, which I guess ultimately is the constitutionality of the resolution, the subject resolution.

"So will you address yourselves initially to that, and then we will proceed from there and see where we go."

The State's attorney did not address himself to the Circuit Judge's question; instead he urged the court to grant the intervention.

Counsel for intervenor said: "If your Honors please, counsel, I came prepared to make a different appeal to your Honors this morning. I may have misunderstood Judge Lewis' invitation, but I didn't hear from my friend on the other side any answers that you were looking for."

The hearing concluded as follows:

MR. SANDACK: "Would it be of any help if we gave you a memorandum on the intervention matter, which we had not really anticipated?"

JUDGE LEWIS: "If we decide we need it, Mr. Sandack, we will request one."

JUDGE RITTER: "I don't see how we can decide that question. It hasn't been fully argued to us. It hasn't been dealt with in the memoranda at all. We would be making a decision without giving counsel an opportunity to present it fully. This is my view about it."

JUDGE LEWIS: "We will inform you."

JUDGE RITTER: "I don't see how we can reach any decision."

Following the hearing the judges held a conference in chambers after which the Circuit Judge directed the clerk to notify counsel to file memoranda on the question of the propriety of intervention in this matter, the memoranda to be filed concurrently within five days, the clerk to hand deliver copies to each member of the court.

On Tuesday, July 1st, original plaintiffs in Petuskey et al. v. Rampton et al. filed a Motion For Leave to File a Supplemental Complaint, and also Consent to Intervention by Brian Florence.

On Wednesday, July 2nd, counsel for intervenor filed his memorandum; and on Monday, July 7th, the State's Attorney filed its memorandum requesting the court to grant intervenor's motion to intervene.

On Monday, July 7th, the Circuit Judge called the judges into session again to consider another three-judge matter, following which the judges had a conference in chambers, the result of which is reflected in Judge Lewis' and Christensen's order of Tuesday, July 8th, from which the Chief Judge of the District Court dissented. That order reads: "The restraining order heretofore issued upon the motion of Brian Florence is dissolved; his motion for leave to file a supplemental complaint is denied; his motion to intervene herein is denied, and this three-judge court is hereby dissolved, the purposes for which it was convened and for which it acquired and retained jurisdiction being deemed served, and the application to intervene being neither timely, appropriate nor sufficient for those purposes.

"Each member of the court reserves the right separately to state his views with respect to the issues raised by the petition to intervene and concerning this order in which Judge Lewis and Judge Christensen concur. Chief Judge Ritter dissents."

It will be observed from the foregoing that counsel were asked by the Chief Judge, at the hearing before him, to submit briefs on one question, whether this is a case requiring a three-judge court. While counsel were proceeding to do this, they were called before a three-judge court and asked to address themselves to another and different question, namely "the right or desirability of allowing purported intervenors to intervene in this case at all at this time." Counsel for intervenors said that he came prepared to make a different appeal, and asked an opportunity to submit a memorandum on the intervention matter, "which we had not really anticipated."

In no real sense was counsel given a reasonable opportunity to present the matter. While briefing the question the Chief Judge had left them, they are asked, in five days, over a week-end including Sunday, to research and brief a different and difficult question.

The procedure followed by Judges Lewis and Christensen in this matter is unique and passing strange. They dissolved the restraining order; and summarily denied Brian Florence's motion to intervene. They also denied "his motion for leave to file a supplemental complaint."

Brian Florence did not file a motion for leave to file a supplemental complaint.

William G. Petuskey, Robert A. Bullough, Clinton M. Black and Farrol R. Lambert, who were the *original plaintiffs* in Petuskey et al. v. Clyde et al. supra, and in Petuskey et al. v. Rampton et al. supra, filed the motion for leave to file a supplemental complaint.

And then the judges attempt to inter this matter with unruly haste by abolishing the three-judge court.

An analysis of what Judges Lewis and Christensen did *not* do is, however, the really interesting matter in this case. (1) They did not dismiss the action which remains pending in the United States District Court before the Chief Judge, to whom it was assigned on Jan-

uary 16, 1963. (2) They did not deny the motion of *plaintiffs in the original action for leave to file a supplemental complaint*. (3) They did not decide the merits of intervenors "claim for additional relief". There was no trial. No evidence was taken. It wasn't fully argued or briefed. (4) They did not decide the merits of the claim of *original plaintiffs* in their supplemental complaint. (5) They did not decide the questions whether the claims in intervention and in the supplemental complaint require adjudication by a three-judge court, more particularly, whether the claims seek a type of relief within the purposes or within the literal language of 28 U.S.C. § 2281. These questions are jurisdictional, and so far haven't been determined by anyone.

In the normal course, the foregoing questions are threshold or preliminary inquiry questions which must be determined by the single district judge before he notifies the Chief Judge of the Court of Appeals that a three-judge court is required. Section 2284 of Title 28 U.S.C. applies only to "any action or proceeding required * * * to be heard and determined by a district court of three judges * * *.". Section 2281 of Title 28 U.S.C. applies only to injunctions "restraining the enforcement, operation or execution of any State statute * *.[1]"

I

■ The first question to be resolved in this proceeding has been answered by the highest authority in a unanimous decision. That question is whether the two judges designated under Section 2281 to sit with the District Judge in passing upon the applications[2] for injunctions to enjoin the enforcement of a state statute on the ground that it was unconstitutional, should have participated in consideration of the motions to intervene and for leave to file a supplemental pleading in the present proceeding?

The answer is that this should have been done by the original District Judge acting alone, and that the two other Judges should not have participated in the consideration of the motions.

This was squarely held by a unanimous United States Supreme Court, in Public Service Commission of Missouri v. Brashear Freight Lines, 312 U.S. 621, 61 S.Ct. 784, 85 L.Ed. 1083 (1941). In that case a statutory three-judge court heard an application for an injunction to enjoin the enforcement of a state statute on the ground that it violated the Federal Constitution. The injunction was denied, but there remained in the case the matter of awarding damages which had arisen out of the granting of a temporary restraining order pending the hearing. The Supreme Court held it was error not to assess these damages in the pending suit, but this should be done by the original district judge acting alone.

The impact of this case as an authoritative pronouncement of law in this area is underscored by the court: "We granted certiorari, 311 U.S. 642, 61 S.Ct. 392, 85 L.Ed. 410, primarily because of the procedural importance of determining the statutory function of a three judge court in dealing with questions such as those here presented."

Speaking through Mr. Justice Black, the court said: "We are of opinion that the two judges called in under § 266 to assist the district judge in passing upon the application for injunction should not have participated in consideration of the motion to assess damages. The limited

---

1. "An interlocutory or permanent injunction restraining the enforcement, operation or execution of *any State statute* by restraining the action of any officer of such State in the *enforcement or execution* of such *statute* * * * shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

2. Petuskey et al. v. Clyde et al., supra. Petuskey et al. v. Rampton et al., supra.

statutory duties of the specially constituted three judge District Court had been fully performed before the motion for assessment of damages was filed. For § 266 of the Judicial Code provides for a hearing by three judges, instead of one district judge, only in connection with adjudication of a very narrow type of controversy—applications for temporary and permanent injunctions restraining state officials from enforcing state laws or orders made pursuant thereto upon the ground that the state statutes are repugnant to the Federal Constitution. The motion for damages raised questions not within the statutory purpose for which the two additional judges had been called. Those questions were therefore for the consideration of the District Court in the exercise of its ordinary jurisdiction, and the three judge requirement of § 266 had no application."

In the case at bar, as in Brashear, "the limited statutory duties of the specially constituted three judge District Court had been fully performed before the motion" of Brian Florence to intervene, and the motion of plaintiffs in the original action for a leave to file a supplemental complaint had been filed. The state statute had been held unconstitutional.

In the case at bar, as in Brashear, the motions "raised questions not within the statutory purpose for which the two additional judges had been called." Those questions were in the case at bar, as in Brashear, "therefore for the consideration of the District Court in the exercise of its ordinary jurisdiction, and the three judge requirement of § 266 had no application."

Many cases under II, infra, illustrate the practice. And, see 77 Harvard Law Review 299 at page 307.

## II

The second question to be resolved in this proceeding also has been answered by the highest authority. This question is whether the claim asserted in intervention and in the supplemental complaint calls for an injunction restraining any state official in the enforcement or execution of any state statute upon the ground of unconstitutionality?

The Supreme Court of the United States, in a decision handed down June 16, 1969, in Powell et al. v. McCormack et al. 395 U.S. 486, 494 n. 3, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) answered this question as well as question I above.

Petitioner, Adam Clayton Powell, attacked as unconstitutional House Resolution 278, adopted March 1, 1967, by the House of Representatives of the Congress, excluding him and directing that the Speaker notify the Governor of New York that the seat was vacant. Powell asked for a three-judge court. The District Court refused to convene a three-judge court and the District of Columbia Court of Appeals affirmed in an opinion, 129 U.S.App.D.C. 354, 395 F.2d 577, 602–603, written by Warren Burger, the new Chief Justice of the Supreme Court.

The District Court denied the application on the ground that House Resolution 278, was not an "Act of Congress" within the meaning of 28 U.S.C. Section 2282, which the court equates to the "state" three-judge court statute, 28 U.S.C. Section 2281, involved in the case at bar.

Judge Burger wrote: "The District Court's conclusion is amply supported by the plain meaning of 'Act of Congress' as used in the statute and by the legislative history and purpose of section 2282. The decided cases demonstrate that the legislative history of § 2282 and its complement, § 2281, requiring three judges to hear injunctive suits directed against federal and state legislation, respectively, indicates that these sections were enacted to prevent a federal judge from being able to paralyze totally the single operation of an entire regulatory scheme, either state or federal, by issuance of a broad injunctive order.

"Kennedy v. Mendoza-Martinez, 372 U.S. 144, 154, 83 S.Ct. 554, 560, 9 L.Ed. 2d 644 (1963) (footnote omitted). See

Zemel v. Rusk, 381 U.S. 1, 7 n. 4, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Phillips v. United States, 312 U.S. 246, 248–251, 61 S.Ct. 480, 85 L.Ed. 800 (1941). The legislative purpose is not served by construing the statute to cover the resolution in this case since the statute is to be construed narrowly. Bailey v. Patterson, 369 U.S. 31, 33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962). House Resolution 278 is a resolution of one House only and relates to the organization and internal governing of the House of Representatives. It creates no broad statutory scheme which would be frustrated by injunctive relief, and it does not contain the attributes of the usual 'Act of Congress' which involves the House of Representatives, the Senate and the President."

The United States Supreme Court approved the determination that "resolutions" which do not establish a broad regulatory program are not within the parallel federal provision, Section 2282, and approved the decision of the then Circuit Judge Burger respecting the denial of a three-judge court, 129 U.S.App. D.C. 354, 395 F.2d 577, 602–603 (1968).

■ As in Powell v. McCormack, respecting an Act of Congress, the Utah Senate Joint Resolution, SJR3, is not a "state statute" within the meaning of 28 U.S.C. Section 2281. Long ago, Hawke v. Smith (No. 1), 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871 (1920), said that the word "legislatures" in the ratification clause of Article V does not mean the whole legislative process of the state—as defined in the state constitution. It means a representative lawmaking body only, because "ratification by a state of a constitutional amendment is not an act of legislation within the proper sense of the word."

■ No doubt the word "legislatures" has the same meaning in the application clause that it bears in the ratification clause of Article V. The application is not "an act of legislation" within the proper sense of the word.

Decisions of the Supreme Court of the United States in school segregation cases, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), 349 U.S. 294, 301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and in the legislative reapportionment cases, Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), holding that the state segregation and reapportionment laws denied equal protection of the laws in violation of the Fourteenth Amendment, have generated many three-judge court cases.

As might be expected, considerable law has developed concerning the scope of 28 U.S.C. Sections 2281 and 2284.

Three of the school segregation cases answer both questions I and II, above.

The litigation in Griffin v. County Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964) began in 1951 when a group of negro school children living in Prince Edward County, Virginia, filed a complaint in the U. S. District Court alleging they were excluded from public schools attended by white children and claiming a denial of equal protection of the law in violation of the Fourteenth Amendment.

The action broadly charged the constitution and laws of Virginia provided a state system of public schools which unconstitutionally segregated school children on the basis of color. This challenge was heard by a District Court of three judges as required by Section 2281.

In 1954 the United States Supreme Court decided Brown v. Board of Education, supra, holding the Virginia segregation laws did deny equal protection. This case and others were remanded to the District Courts to enter such orders as "necessary and proper to admit claimants to public schools on a racially nondiscriminatory basis with all deliberate speed."

Efforts to desegregate Prince Edward County's Schools met with resistance. The Supervisors of Prince Edward County refused to levy any school taxes for the 1959–60 school year, and the schools closed.

A private group, the Prince Edward School Foundation, was formed to operate private schools for white children in Prince Edward County.

The Virginia General Assembly adopted a tuition grant program making every child, regardless of race, eligible for tuition grants to attend a non-sectarian private school or a public school outside his locality, and also authorizing localities to provide their own tuition grants. The Prince Edward Board of Supervisors then passed an ordinance so that each child received a total from the state and county of $225 if in elementary school or $250 if in high school. In the 1960–61 session the major source of financial support for the Foundation was in the indirect form of these state and county tuition grants paid to children attending Foundation schools.

At the same time the County Board of Supervisors passed an ordinance allowing property tax credits up to 25% for contributions to any "nonprofit nonsectarian private school" in the county.

Petitioners in Griffin filed a supplemental complaint in 1961 adding new parties and seeking to enjoin the respondents "from refusing to operate an efficient system of public free schools in Prince Edward County and to enjoin payment of public funds to help support private schools which excluded students on account of race."

The District Court finding that "the end result of every action taken by that body (Board of Supervisors) was designed to preserve separation of the races in the schools of Prince Edward County," enjoined the county from paying tuition grants or giving tax credits so long as the public schools remained closed. And the District Court held that "the public schools of Prince Edward County may not be closed to avoid the effect of the law of the land as interpreted by the Supreme Court, while the Commonwealth of Virginia permits other public schools to remain open at the expense of the taxpayers."

The Court of Appeals, 4 Cir., 322 F.2d 332 reversed.

The Supreme Court reversed the Circuit and wrote: "Before reaching the substantial questions presented, we shall note several procedural matters urged by respondents in a motion to dismiss the supplemental amended complaint filed July 7, 1961—ten years after this action was instituted. * * *

"(a) It is contended that the amended supplemental complaint presented a new and different cause of action from that presented in the original complaint. The supplemental pleading did add new parties and rely in good part on transactions, occurrences, and events which had happened since the action had begun. But these new transactions were alleged to have occurred as a part of continued, persistent efforts to circumvent our 1955 holding that Prince Edward County could not continue to operate, maintain, and support a system of schools in which students were segregated on a racial basis. The original complaint had challenged racial segregation in schools which were admittedly public. The new complaint charged that Prince Edward County was still using its funds, along with state funds to assist private schools while at the same time closing down the county's public schools, all to avoid the desegregation ordered in the Brown cases. The amended complaint thus was not a new cause of action but merely part of the same old cause of action arising out of the continued desire of colored students in Prince Edward County to have the same opportunity for state-supported education afforded to white people, a desire thwarted before 1959 by segregation in the public schools and after 1959 by a combination of closed public schools and state and county grants to white children at the Foundation's private schools. Rule 15(d) of the Federal Rules of Civil Procedure

plainly permits supplemental amendments to cover events happening after suit, and it follows, of course, that persons participating in these new events may be added if necessary. Such amendments are well within the basic aim of the rules to make pleadings a means to achieve an orderly and fair administration of justice.

"(b) When this action was originally brought in 1951, it broadly charged that the constitution and laws of Virginia provided a state system of public schools which unconstitutionally segregated school children on the basis of color. This challenge was heard by a District Court of three judges as required by 28 U.S.C. § 2281. When in Brown we held the school segregation laws invalid as a denial of equal protection of the laws under the Fourteenth Amendment and remanded for the District Court to fashion a decree requiring abandonment of segregation 'with all deliberate speed,' the three-judge court ceased to function, and a single district judge took over. Respondents contend that the single judge erroneously passed on the issues raised by the supplemental complaint and that we should now delay the case still further by vacating his judgment along with that of the Court of Appeals and remanding to the District Court for a completely new trial before three judges. We reject the contention. In Rorick v. Board of Comm'rs of Everglades Drainage Dist., 307 U.S. 208, 212, 59 S.Ct. 808, 83 L.Ed. 1242 (1939), we said, in interpreting the three-judge statute (then § 266 of the Judicial Code of 1911, as amended, 28 U.S.C. (1934 ed.) § 380):

> " 'Despite the generality of the language' of that Section, it is now settled doctrine that only a suit involving 'a statute of general application' and not one affecting a 'particular municipality or district' can invoke § 266."

"While holding as to the constitutional duty of the Supervisors and other officials of Prince Edward County may have repercussions over the State and may require the District Court's orders to run to parties outside the county, it is nevertheless true that what is attacked in this suit is not something which the State has commanded Prince Edward to do—close its public schools and give grants to children in private schools—but rather something which the county with state acquiescence and cooperation has undertaken to do on its own volition, a decision not binding on any other county in Virginia. Even though actions of the State are involved, the case, as it comes to us, concerns not a state-wide system but rather a situation unique to Prince Edward County. We hold that the single district judge did not err in adjudicating this present controversy."

The holding is that only a suit involving a "statute of general application" and not one affecting a particular county only can invoke Section 2281.

The case at bar presents a suit involving no "statute" at all. It involves a "resolution" affecting not just one county but the whole of the United States of America. It, however, does not affect the State of Utah in such manner as to invoke Section 2281.

The case at bar in no way seeks to enjoin a "state statute".

In Griffin, efforts to desegregate Prince Edward County's schools met with resistance. Efforts properly to reapportion Utah's legislatures have met with resistance since statehood in 1896, (see dissenting opinion in Petuskey et al. v. Clyde et al. supra, 234 F.Supp. at pages 968–969, and Petuskey, et al. v. Rampton et al. supra, 243 F.Supp. pages 369–374.)

In Griffin the court said the amended complaint "was not a new cause of action but merely a part of the same old cause of action arising out of the continued desire of colored students in Prince Edward County to have the same opportunity for state-supported education afforded to white people." In the case at bar, as in Griffin, the supplemental pleading and motion to intervene added new parties and relied in good part on transactions, occurrences and events

which had happened since the action had begun. Reliance principally, however, is upon an event that happened in 1965, the adoption of SJR3, and the transactions and occurrences since that time leading to the imminent accumulation of calls from thirty-four of the states, for a constitutional convention to amend the Constitution of the United States which would nullify the Supreme Court's "one-man, one vote" line of decisions.

John J. Parker, former Chief Judge of the Fourth Circuit, in Davis v. County School Board of Prince Edward County, 142 F.Supp. 616 (1956), shows the way these matters ought to be handled. He followed, what has now become the practice, i. e. to permit a single judge to supervise enforcement of the decree. This plainly meets the literal requirement of Section 2281, that only the "application" is to be "heard and determined" by three judges under Section 2284.

In Davis, after Brown v. Board of Education had reversed a three-judge court's denial of relief, the court vacated and set aside its former decree, declared the Virginia constitutional and statutory provisions void, and enjoined defendants from refusing on account of race or color to admit to any school under their supervision any child qualified to enter.

The case was retained on the docket for the entry of further orders which might be necessary in the enforcement of the decree.

The plaintiffs filed a motion asking that the defendants be required to take steps looking to the completion of the desegregation process by September 1956, and to file interim reports showing what they were doing to that end.

The court pointed out that the statute requires the constitution of three judges only to hear the application for injunction to restrain the enforcement of a state statute upon the ground of its unconstitutionality.

Showing concern for the burden the three-judge procedure throws upon the courts, Judge Parker says the history of this provision and the necessity of construing it strictly "was succinctly stated by the Supreme Court, speaking through Mr. Justice Frankfurter, in Phillips v. United States, 312 U.S. 246, 248–251, 61 S.Ct. 480, 482, 85 L.Ed. 800 (1941), as follows:

'By § 266, which is set forth in the margin, Congress provided an exceptional procedure for a well-understood type of controversy. The legislation was designed to secure the public interest in "a limited class of cases of special importance". Ex parte Collins, 277 U.S. 565, 567, 48 S.Ct. 585, 72 L.Ed. 990. It is a matter of history that this procedural device was a means of protecting the increasing body of state legislation regulating economic enterprise from invalidation by a conventional suit in equity. While Congress thus sought to assure more weight and greater deliberation by not leaving the fate of such litigation to a single judge, it was no less mindful that the requirement of three judges, of whom one must be a Justice of this Court or a circuit judge, entails a serious drain upon the federal judicial system particularly in regions where, despite modern facilities, distance still plays an important part in the effective administration of justice. And all but the few great metropolitan areas are such regions. Moreover, inasmuch as this procedure also brings direct review of a district court to this Court, any loose construction of the requirements of § 266 would defeat the purposes of Congress, as expressed by the Jurisdictional Act of February 13, 1925, to keep within narrow confines our appellate docket. Moore v. Fidelity & Deposit Co., 272 U.S. 317, 321, 47 S.Ct. 105, 71 L.Ed. 273. The history of 266 (see Pogue, State Determination of State Law, 41 Harv.L. Rev. 623, and Hutcheson, A Case for Three Judges, 47 Harv.L.Rev. 795), the narrowness of its original scope, the piece-meal explicit amendments which were made to it (see Act of March 4, 1913, 37 Stat. 1013, and Act of February 13, 1925, 43 Stat. 936, amending § 238 of the Judicial Code),

the close construction given the section in obedience to Congressional policy (see, for instance, Moore v. Fidelity & Deposit Co., supra; Smith v. Wilson, 273 U.S. 388, 47 S.Ct. 385, 71 L.Ed. 699; Ex parte Collins, supra; Oklahoma Gas Co. v. Oklahoma Packing Co., 292 U.S. 386, 54 S.Ct. 732, 78 L.Ed. 1318; Ex parte Williams, 277 U.S. 267, 48 S.Ct. 523, 72 L.Ed. 877; Ex parte Public National Bank, 278 U.S. 101, 49 S.Ct. 43, 73 L.Ed. 202; Rorick v. Bd. of Com'rs, 307 U.S. 208, 59 S.Ct. 808, 83 L.Ed. 1242; Ex parte Bransford, 310 U.S. 354, 60 S.Ct. 947, 84 L.Ed. 1249, combine to reveal § 266 not as a measure of broad social policy to be construed with great liberality, but as an enactment technical in the strict sense of the term and to be applied as such.

'To bring this procedural device into play—to dislocate the normal operations of the system of lower federal courts and thereafter to come directly to this Court—requires a suit which seeks to interpose the Constitution against enforcement of a state policy, whether such policy is defined in a state constitution or in an ordinary statute or through the delegated legislation of an "administrative board of commission". The crux of the business is procedural protection against an improvident state-wide doom by a federal court of a state's legislative policy. This was the aim of Congress and this is the reconciling principle of the cases.'

"Even though the court is properly constituted under the statute, there is no occasion to continue the participation of the two extra judges after the question of the constitutionality of the statute and constitutional provision have been settled and these are no longer in the case.

* * * "And in Ex parte Bransford, 310 U.S. 354, 361, 60 S.Ct. 947, 951, 84 L.Ed. 1249, it was said: 'Jurisdiction, properly assumed, may be lost by the special court, when it appears that a prerequisite such as need for relief against state officers is lacking.' Here the prerequisite lacking is need to have a state statute declared invalid, as that matter has been settled by the decision of the Supreme Court as well as by the order heretofore entered herein, which was a final order granting an injunction, from which no appeal has been taken.

"Almost directly in point is the decision of the Supreme Court in Public Service Commission of Missouri v. Brashear Freight Lines, 312 U.S. 621, 61 S.Ct. 784, 786, 85 L.Ed. 1083.

\* \* \* \* \* \*

"It is perfectly clear in this case that, with the unconstitutionality of the Virginia statute and constitutional provision definitely adjudicated, the questions raised by the subsequent motion 'are not within the statutory purpose for which the two additional judges had been called'. In such situation, the three-judge court should be dissolved and the two additional judges should retire from the case." Davis v. County School Board of Prince Edward County, 142 F.Supp. at 617–618.

In Davis, the plaintiffs contended that because the court of three judges was originally proper in this case, it should continue to handle the case, although the presence of the two additional judges is not required for the decision of the remaining matters, "which are no more than the protection of the constitutional rights of the plaintiffs under the final decree heretofore entered pursuant to the Supreme Court's decision. * * * The subsequent motions in the cause, relating to matters as to which the action of three judges is not necessary, should be referred to a single judge under the authority of the decision of the Supreme Court in Public Service Commission of Missouri v. Brashear Freight Lines, supra, 312 U.S. 621, 61 S.Ct. 784, 85 L.Ed. 1083.

" * * * Here there has been an adjudication of the questions for the decision of which the two additional judges

were required, final decree has been entered and, as in the Brashear Lines case, supra, all that remains to be done is within the jurisdiction of a court composed of a single judge." 142 F.Supp. at 620.

Chief Judge Bazelon's opinion in Hobson v. Hansen, 256 F.Supp. 18 (1966), is an excellent authority for both propositions I and II, above. It was specifically approved by the District of Columbia Court of Appeals in Smuck v. Hobson, 408 F.2d 175, 182 (1969). There the complaint consisted of six counts; only count one challenged the then-existing statute by which the members of the United States District Court appointed the board of education; counts two through six did not challenge the statute but only the school board's policies alleged to result in various racial and economic discriminations by school authorities against school children and teachers against which an injunction was sought.

The United States District Judge requested the Circuit Chief Judge to convene a three-judge court, pursuant to 28 U.S.C. Section 2284, to hear only the constitutional challenge in count one.

Defendant's motion requested the Chief Judge to expand his order to include counts two through six. Judge Bazelon wrote: "They contend, citing authorities, that a 'three-judge court, once impanelled under 28 U.S.C. § 2284, has complete jurisdiction over the entire case and neither a single-judge court nor the chief judge of the circuit has the power to divest the three-judge court of its jurisdiction.[4]' In the context of this case, I disagree.

"4. Since Judge Wright requested a three-judge court only for count one (Hobson v. Hansen, supra note 1), the question arises whether the Chief Judge's authority, ministerial or discretionary, may be extended to counts two through six."

\* \* \* \* \*

"Moreover, defendants' argument that, because count one of the complaint requires a three-judge District Court, counts two through six must be submitted to that statutory court misconceives

the function of the three-judge court. 'The three judge procedure is an extraordinary one, imposing a heavy burden on federal courts, with attendant expense and delay. That procedure, designed for a specific class of cases, sharply defined, should not be lightly extended.' Oklahoma Gas & Electric Co. v. Oklahoma Packing Co., 292 U.S. 386, 391, 54 S.Ct. 732, 734, 78 L.Ed. 1318 (1934). To allow joinder of claims unrelated to the legislation under attack would severely undermine the sharply limited purpose for three-judge courts, at heavy cost to judicial administration both in the lower federal courts and in the Supreme Court.

"I therefore conclude that since only count one of the instant complaint challenges an Act of Congress on constitutional grounds, and since the remainder of the complaint raises wholly separable and unrelated claims based on different facts and challenging different acts by the defendants, the three-judge court lacks authority to hear the latter claims.

\* \* \* "As Chief Judge of the Circuit, I have the authority *and duty under § 2284* to refuse certification of these claims which cannot conceivably involve substantial constitutional attacks upon an Act of Congress and which are wholly extraneous to the issue properly before the three-judge court under count one."

### III

Can a Legislature, which has been determined unconstitutionally apportioned by a three-judge Federal Court adopt a valid Resolution applying to Congress to call an Article V convention for the purpose of continuing its own unconstitutional existence?

The answer to this question is that the Legislature is not empowered to do so.

For the purposes of this proceeding we propose only to show the substantiality of the Federal Constitutional question involved, the case being set down, with

the filing of this opinion, for plenary hearing with full briefing and argument on the merits.

We take it that Baker v. Carr,[3] Reynolds v. Sims,[4] the series of five other cases[5] decided at the same time, and cases decided since, by the Supreme Court, have settled any problem of "standing", justiciability, and "political question" so far as this matter is concerned, for in our view it is a proceeding to implement and enforce the decrees in the two Utah Reapportionment cases, supra, still pending before the District Judge.

The United States Supreme Court has considered without hesitation the line of cases involving the validity of ratification of constitutional amendments.[6] The first, Hawke v. Smith (No. 1), 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871 (1920), is of considerable importance to our discussion here.

The constitution of Ohio extended the referendum procedure to any ratification by the legislature of proposed amendments to the Federal Constitution.

The Ohio legislature ratified the 18th Amendment (Prohibition). A citizen-taxpayer-voter of Ohio sued to restrain the Secretary of State of Ohio from spending public money to prepare and print ballots for the referendum.

The Supreme Court of the United States reversed the Ohio Supreme Court and unanimously held the provisions of the state constitution requiring a referendum were in conflict with Article V of the Constitution of the United States.

The only question really for determination, said the Court, is: "What did the framers of the Constitution mean in requiring ratification by 'Legislatures'?

The Court (which included Holmes and Brandeis) answered: "The argument to support the power of the State to require the approval by the people of the State of the ratification of amendments to the Federal Constitution through the medium of a referendum rests upon the proposition that the Federal Constitution requires ratification by the legislative action of the States through the medium provided at the time of the proposed approval of an amendment. This argument is fallacious in this—ratification by a State of a constitutional amendment is not an act of legislation within the proper sense of the word. It is but the expression of the assent of the State to a proposed amendment.

\* \* \* "It is true that the power to legislate in the enactment of laws of a State is derived from the people of the State. But the power to ratify a proposed amendment to the Federal Constitution has its source in the Federal Constitution. The act of ratification by the State derives its authority from the Federal Constitution to which the State and its people have alike assented."

The word "legislatures" in the ratification clause of Article V does not mean the whole legislative process of the state—as defined in the state constitution. Hawke v. Smith says it means the representative lawmaking body only, because "ratification by a state of a con-

3. 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

4. 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed. 2d 506 (1964).

5. Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964); Lucas v. Forty-Fourth General Assembly of State of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); Maryland Committee v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964); Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964); WMCA, Inc.

v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964).

6. Hawke v. Smith (No. 1), 253 U.S. 221, 40 S.Ct. 495 (1920); National Prohibition Cases, 253 U.S. 350, 386, 40 S.Ct. 486, 64 L.Ed. 946 (1920); Leser v. Garnett, 258 U.S. 130, 137, 42 S.Ct. 217, 66 L.Ed. 505 (1922); Fairchild v. Hughes, 258 U.S. 126, 42 S.Ct. 274, 66 L.Ed. 499 (1922); United States v. Sprague, 282 U.S. 716, 51 S.Ct. 220, 75 L.Ed. 640; Coleman v. Miller, 307 U.S. 433, 59 S. Ct. 972, 83 L.Ed. 1385 (1939).

stitutional amendment is not an act of legislation within the proper sense of the word."

No doubt the word "legislatures" has the same meaning in the application clause that it bears in the ratification clause of Article V. The application is not "an act of legislation" within the proper sense of the word.

The court in Hawke v. Smith declares that Article V is a grant of authority by the people to Congress. It provides: " 'The Congress, whenever two-thirds of both houses shall deem it necessary, shall propose amendments to this Constitution, or, on the application of the Legislatures of two-thirds of the several states, shall call a convention for proposing amendments." Hence, "when state legislatures petition Congress for an Article V convention they act not as lawmakers under their state constitution but rather as agents of the Federal government performing a federal function. That is, they are acting as 'representatives of the people of the state under the power granted by Article V. The article therefore imports a function different from that of lawmaker and renders inapplicable the conditions which usually attach to the making of state laws.' " [7]

■ During the time the procedure for amending the Constitution is being pursued as provided in Article V, the provision sought to be amended, as interpreted by the Supreme Court, remains in effect until the amending process is completed. It shocks one to suppose that the operation of the Bill of Rights would be suspended during a time an amendment to alter or repeal it was being considered.

"Any attempt to repeal the Bill of Rights that violated those rights in the process of repeal therefore would be subject to challenge. In this sense constitutional government, short of revolution, is not reversible."

Hardly less shocking is the supposition that the operation of the Equal Protection Clause, as construed by the Supreme Court, would be suspended during the time an amendment to alter it was being considered.

■ Hence any attempt to repeal the Equal Protection Clause, as the Court interprets it, that violates the "one man—one vote" right of the people is subject to challenge. "That right remains in effect until repealed and must necessarily span the amending process."

■ The Utah legislature, which had been judicially determined unconstitutionally apportioned, violated that right during the amending process by adopting SJR3 calling upon Congress to convene an Article V convention.

In an essay on this subject suggesting the ideas just expressed, one writer, Peter H. Wolf, 52 American Bar Association Journal, pp. 329–330, says: "The Constitution has been authoritatively and unequivocally interpreted to require that 'the seats in both houses of a bicameral state legislature must be apportioned on a population basis'. The very least the constitutional axiom requires is that when a state legislature participates in the amending process— the only specifically delineated function of state legislatures under the Federal Constitution—concerning an impairment of constitutional rights as embodied in that legislature's own composition, the courts will demand that that legislature accurately reflect the only majority by which our system permits impairment of such rights. Thus, a malapportioned state legislature may not lawfully ratify a constitutional amendment that might permit that malapportionment to be perpetuated."

Observing that this situation is unique in our constitutional history, the writer says: "For not only does a proposed antireapportionment amendment specifically impair a pre-existing constitutional

---

7. Bonfield, The Dirksen Amendment and the Article V Convention Process, 66

Michigan Law Review 949, 959 (March 1968).

right, but its ratification by legislatures that may be malapportioned attempts alteration by means that inherently violate that same constitutional right. The outcome of each challenge can logically and constitutionally result only in an invalidation of a malapportioned state legislature's bootstrap ratification of its own unconstitutional composition."

The situation has evoked many other expressions to describe it. Senator Abraham Ribicoff of Connecticut says these proposed amendments would allow "the rotten boroughs to decide whether they should continue to be rotten." Senator Proxmire of Wisconsin says to regard such resolution as valid "would be like permitting all Democrats to have two votes in a referendum to determine whether or not Democrats should have two votes." Senator Tydings of Maryland argues such a legislature has no competence to initiate amendments to the Constitution "to make legal its own illegality."

Another expression which should be added is that this proposed amendment would allow the unconstitutional legislators to feather their own nests.

In testimony before the Senate Subcommittee on Constitutional Amendments given by Royce Hanson, associate professor of government at American University, he stated:

"Finally, S.J.Res. 2 provides for ratification by the legislatures of the States. This procedure for this amendment presents every legislature with an irresistible conflict of interest. Every member has a personal interest in the amendment. Too often such interests exceed the public interest. If legislatures were to vote on it, I think we can predict in about every State where the legislature is under court mandate to reapportion, lawsuits challenging the capacity of a malapportioned legislature to sit in judgment of this amendment, would occur. Even if all the suits are lost, it seems to me incredible that the Congress would be a party to so cozy an arrangement as this procedure permits."

Mr. Wolf, of the District of Columbia Bar, in article referred to supra, says: "Professor Hanson's misgivings that ratification would be far more on the level of self-preservation than on the higher plane of constitutional concern are amply illustrated by the fact that some state legislatures that have enacted reapportionment plans under court order have provided that the plans shall be immediately and automatically rescinded if an antireapportionment amendment becomes effective. Similar misgivings arise from a realization of the misleading quality of question used as the battle cry of those supporting an antireapportionment amendment—'What is wrong with letting the people decide?' It is not the people who would ratify an antireapportionment amendment; it is the state legislatures. If 'letting the people decide' refers to the referendum provisions of the Dirksen amendment, those provisions are totally irrelevant to the amending process itself."

What this court said in Petuskey v. Rampton, supra, 243 F.Supp. pages 369, 371, 373–374, applies: "There is a whole nest of vipers in this Section. More difficult, puzzling questions you are not likely to find. They arise out of the attempt of the legislators to continue themselves in office as long as possible * * *."

"It is manifest this situation is monstrous, in a small way. It is wholly lacking in rationality. The Legislature has set up a scheme that too long will delay constitutional reapportionment and equal representation in the Utah Legislature.

\* \* \* \* \* \*

\* \* \* "But Utah's legislatures have never shown any enthusiasm for reapportionment on the basis of population. This one was no exception.

\* \* \* \* \* \*

"It is manifest in the 1965 Act that the legislators sought to continue themselves in office until the end of their elected terms, eleven senators until December 31, 1968. And this, in face of

the fact that the acts under which they had been elected had been held unconstitutional and moreover were repealed by them. For a very long period of time all efforts to obtain a constitutionally apportioned Legislature in this State have been frustrated. There is now a further unfortunate delay until January 1967 before we shall have a constitutionally apportioned Legislature.[10] ”

“10. It is interesting to note the speed by which the last State Legislature memoralized Congress (S.J.R. #5) to call a constitutional convention to provide for reapportionment ‘on factors other than population’, which resolutions the State Senate passed on the tenth day of the session, compared to the Legislature’s hesitancy to properly reapportion under the mandate of this court, which action occurred on the final (sixtieth) day of the session.”

In Petuskey v. Clyde, supra, dissenting opinion, the writer said: “I fully agree that it is the primary duty of the Utah Legislature to reapportion so as to establish a valid representation in the legislature. But, it has never done so, not once, since statehood.

“This State has a long history of frustrated attempts to reapportion.

\*   \*   \*   \*   \*   \*

\*   \*   \*   “One reason for this abstention was to give the legislature an opportunity to apportion constitutionally.

“Well, they didn’t. The pendency of this action in this court, and of the many actions in the United States Supreme Court and other courts did not have the desired effect upon the legislature. The legislators met in 1963 and came out with a formula that is patently wrong.”

In Petuskey v. Rampton, supra, this court held: “And particularly, nothing we do today is to be interpreted as authorizing legislative action with respect to any amendment which may be proposed to the Constitution of the United States to permit apportionment including factors other than population.

“ \*   \*   \* Should the Legislature, between now and January 1, 1967, attempt to reapportion unconstitutionally or attempt to ratify any proposed amendment to the Constitution of the United States to apportion one or both houses of the Legislature on factors other than population, it will be this court’s duty to give further consideration to the necessity of giving plaintiffs injunctive and affirmative relief by judicial decree, and for such purpose we again retain jurisdiction.

\*   \*   \*   \*   \*   \*

“Having regard to the long period of time during which all efforts to obtain a constitutionally apportioned Legislature have been frustrated in this State, and to the further unfortunate delay until January 1967 before we shall have a constitutionally apportioned Legislature, well-known general principles of equity require that the Legislature not consider or vote upon any proposal to amend the Constitution of the United States on the subject of legislative reapportionment.”

Petuskey v. Rampton, supra, was a final judgment from which no appeal was taken; and the foregoing is the law of the case, applicable in the present proceeding. It is a plain holding of the court and we ought to feel bound by it. Instead, the judges’ order of July 8, 1969 backs down from it and attempts to overrule it. This, in my view, is a disorderly retreat from a sound and just position.

Based upon ideas of practicality, the ordinary, customary legislation needed to keep a state government going, has been held valid though the legislature is unconstitutionally apportioned.

There isn’t the same practical problem in holding void the legislators’ attempt to continue themselves in their illegal state of unconstitutional apportionment. And there certainly is the violation of “some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal” \*, in allowing them to feather

---

\* Cardozo, Loucks v. Standard Oil Co., 224 N.Y. 99, 111 (1918), 120 N.E. 198, 202.

their own nest in hopeful expectation that it will be in perpetuity.

Decisions of the United States Supreme Court arising out of the Civil War provide apt analogies. "As a rule, the official actions of the de facto but not de jure Confederate state governments that were directed toward the perpetuation of the very things that made them de facto rather than de jure were deemed void. For example, bonds issued in aid of their prosecution of the war against the United States were held unenforceable." 66 Mich.L.Rev. 949.

There is one much discussed case, Fortson, Secretary of State of Georgia, v. Toombs, 379 U.S. 621, 85 S.Ct. 598, 13 L.Ed.2d 527 (1965), in which the Supreme Court, *per curiam*, has indicated its views on the power of malapportioned legislatures to submit a state constitutional reapportionment amendment to the people directly.

A three-judge district court in Georgia held the legislature malapportioned, allowed the 1964 election to be held under existing statutes, but restricted the power of the legislature so chosen, *inter alia*, by enjoining the legislature from submitting an entirely new constitution to the people for adoption until it was reapportioned.

The *per curiam* decision of the Court reads: "The situation has changed somewhat since the 1964 election, as both the Senate and House have new members, and appellees, for whose benefit the challenged provision was added, say it is now highly speculative as to what the 1965 legislature will do and suggest the paragraph in question be vacated as moot.

"We vacate this part of the decree and remand to the District Court, to whom we give a wide range in moulding a decree, for reconsideration of the desirability and need for the on-going injunction in light of the results of the 1964 election and the representations of appellees."

The opinion of Justices Harlan and Stewart concurring in part and dissenting in part (page 623, 85 S.Ct. page 599) reads: "This is the first time that the Court, after plenary briefing and argument, has been called on to consider the propriety of interim arrangements prescribed by a district court pending the effectuation of its decision requiring reapportionment of a branch of a state legislature."

On page 624, 85 S.Ct. on page 600 Justice Harlan says: "The Court's disposition of this case, of course, involves a holding that at least as to item (2) the case is not moot. For, contrary to what my Brother Goldberg says in his dissenting opinion (pp. 636–638, 85 S.Ct. 598,) and my Brother Clark seems to recognize (ante), the Court does not remand the case to the District Court for a determination on the issue of mootness, but only to decide whether any injunctive relief is now appropriate in light of what has transpired since such relief was first granted."

The per curiam disposition of the majority indicates approval by the Supreme Court of the lower Court's injunction, and moreover, it is a decision that the unconstitutionally apportioned legislature's attempt to propose its own wholly new constitution to the people was invalid.

One year after Fortson v. Toombs, five members of the court, through Justice Black, asserted that the same Georgia legislature was empowered to select the governor under the Georgia constitution since neither Howard Callway nor Lester Maddox received a majority of the votes cast. Fortson v. Morris, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966). Chief Justice Warren and Justices Douglas, Brennan and Fortas dissented.

Wherefore, the Court makes the following Findings and Orders:

1. The plaintiffs in the original reapportionment suit Petuskey v. Rampton, should be and hereby are

granted leave to file and serve the Supplemental Complaint, for the reasons and upon the grounds set out in their verified Consent to Intervention and Motion to File Supplemental Complaint dated July 1, 1969 and in their Memorandum dated and filed July 2, 1969, Paragraph 3 on page 8 thereof, through and including pages 9, 10 and to the middle of page 11, all of which is referred to and incorporated herein by reference.

2. Brian Florence should be and is hereby granted leave to intervene as a plaintiff in this action in order to assert his Claim in Intervention for Additional Relief for the reasons and upon the grounds set forth in his verified Motion to Intervene as a Plaintiff and Claim in Intervention for Additional Relief, filed June 6, 1969, and in his Memorandum dated and filed July 2, 1969, Paragraph 5 (which should be numbered 4), on page 11 thereof, through and including pages 12, 13 and 14, all of which is referred to and incorporated herein by reference.

3. Original plaintiffs' prayer for a preliminary injunction mandatorily requiring Clyde L. Miller, Secretary of State of Utah, or other proper officer, to advise Congress of the actions taken by this Court declaring the invalidity and unconstitutionality of S.J.R. No. 3 and requesting the withdrawal of said Resolution should be and is hereby granted and counsel is directed to prepare the necessary papers.

### FINAL FINDINGS, CONCLUSIONS, JUDGMENT AND ORDER

On October 10, 1969, this matter came on before Chief Judge Willis W. Ritter, sitting as United States District Judge for the District of Utah, for final hearing on the merits on the questions of law (1) whether or not the preliminary injunction entered pursuant to opinion on August 6, 1969, should be made permanent, and (2) whether or not a declaratory judgment should be entered.

Final Argument having been heard, the Court makes the following Findings of Fact and Conclusions of Law in support of the Judgment and Permanent Injunction Order entered this date:

### FINDINGS OF FACT

1. Brian Florence, intervenor herein, is a citizen of the United States and of the State of Utah, a resident of Weber County, State of Utah, and a qualified voter of the State of Utah entitled to vote in his state representative and senatorial districts in Weber County, Utah. He is also the duly elected and qualified representative to the Utah State House of Representatives for Representative District No. 31, Weber County, Utah, having been first elected to said office in the General Election of November 1968, for a term of two years as provided by law.

2. Plaintiffs William G. Petuskey, Robert A. Bullough, Clinton M. Black and Farrol R. Lambert are citizens of the United States and of the State of Utah, and are residents of, and qualified voters in Salt Lake County, Utah.

3. On September 12, 1964, this Court, sitting as a statutory three-judge court, entered its Judgment declaring unconstitutional the Utah Reapportionment Act of 1963, Title 36, Laws of Utah 1963. That Judgment permitted the 1965 Utah Legislature to be elected under that invalid apportionment act in order that it may enact a valid apportionment act, but noted that "it is the duty of the legislature as well as the duty of this court to approach the problem of apportionment under existing law" (234 F.Supp. 960, 964, n. 6).

4. On January 28, 1965, the 1965 Utah State Legislature which had been elected under the invalid 1963 Utah Apportionment Act adopted S.J.R. No. 3, entitled:

A Joint Resolution of the Senate and House of Representatives of the Thirty-Sixth Legislature of the State of Utah Applying to Congress of the United States to Call a Convention for the Purpose of Proposing an Amendment to the Constitu-

tion of the United States to Provide for Apportioning the Membership of One House of a Bicameral Legislature on Factors Other Than Population.

A copy of that Resolution is attached to, and incorporated as a part of these Findings of Fact and Conclusions of Law.

5. At the date of filing of the intervenor's Motion to Intervene and at all subsequent dates, the legislatures of thirty-three states of the United States had submitted petitions or memorials to the Congress of the United States calling for the convening of a constitutional convention, in the manner and form and at the times set forth in the publication on file in this action entitled "State Petitions and Memorials to Congress on the Subject of Apportionment of State Legislatures, 87th Congress—90th Congress (to February 1, 1968)" and the addendum to that publication dated June 19, 1969. This Court takes judicial notice of the various petitions and memorials set forth in those publications, pursuant to the stipulation between the parties on file herein.

■ 6. This court takes judicial notice that 34 valid petitions from the legislatures of the various states, requesting Congress to call a Constitutional Convention, will constitute the two-thirds of the several states specified by Article V, Constitution of the United States, to implement the convention call procedure provided for by that Article.

## CONCLUSIONS OF LAW

1. This Court's jurisdiction in this proceeding is founded upon 28 U.S.C. § 1343(3) and 42 U.S.C.A. §§ 1983 and 1988.

2. The prospect of Congressional action calling a constitutional convention based upon the applications of two-thirds of the several states, including the Utah resolution, threatens real and substantial injury to the interests of intervenor and of plaintiffs. Any amendment authorizing representation in one house of a state legislature on a basis other than population would validate apportionment plans which would deny plaintiffs and intervenor their constitutionally-protected right to a vote equal in value to that of every other qualified voter in the State of Utah and would permit a discrimination in representation against the more heavily populated urban counties in which they reside. Such an amendment would further injure intervenor in that it would validate apportionment plans giving disproportionate representation in the state legislature to districts less heavily populated than intervenor's district, thereby reducing his capacity and the capacity of other representatives similarly situated, as representatives of the more heavily populated districts, to provide representation in the best interests of the voters of such districts, who constitute the majority of the State's qualified voters.

■ 3. The action of the 1965 Utah State Legislature, in adopting a resolution calling for a federal constitutional convention, constitutes an exercise of a federal constitutional function under Article V of the Constitution of the United States. That action, together with similar action by other state legislatures may require Congress to comply by calling such a convention. In view of the adoption of such resolutions by 33 states, including the state of Utah, there is a substantial prospect that, with the adoption of a resolution by one additional state, Congress will be compelled to determine the effect to be given to the various resolutions, including the Utah resolution. This Court concludes that such Congressional action should not be based upon or compelled by an invalid resolution.

■ 4. As used in Article V provision requiring Congress to call a constitutional convention "on the Application of the Legislatures of two thirds of the several States", the word "legislatures" is construed by this Court to mean

state legislatures constituted in compliance with applicable federal constitutional requirements. The objective of that provision is to assure that a method for proposing amendments to the federal constitution is available to a body representative of the people; and it is essential to the validity of the action of a state legislature in performing that federal function that the people be represented in accordance with the requirements of the equal protection clause, Fourteenth Amendment, Constitution of the United States. The 1965 Legislature of the State of Utah was determined prior to the enactment of S.J.R. No. 3 to be unconstitutionally apportioned; and the attempt of that legislature to exercise its federal function by that resolution must be and hereby is, determined to be invalid.

5. The enactment of S.J.R. No. 3 by the 1965 Utah State Legislature was an attempt by that unconstitutionally-apportioned legislature to exercise power under Article V to preserve its then unconstitutional malapportionment without first complying with existing constitutional requirements. That attempt is inconsistent with the earlier indication of this Court that "it is the duty of the legislature as well as the duty of this Court to approach the problem of apportionment under existing law" and is totally invalid and without effect. Any other conclusion would permit the legislature to take advantage of its unconstitutionally-acquired legislative power and exercise that power to preserve its unconstitutional status. It is elementary constitutional law that any attempt to alter the Constitution must be effected consistently with constitutional requisites.

6. For the above reasons, it is the Conclusion of this Court that S.J.R. No. 3, enacted January 28, 1965 by the 1965 Utah State Legislature is invalid and of no force or effect as an application to Congress under Article V, Constitution of the United States.

7. The issues concerning the validity of S.J.R. No. 3 determined by the foregoing Conclusions have not heretofore been presented to or decided by this Court.

8. In order that the invalidity of SJR No. 3 may be brought to the attention of Congress and to assure that said Resolution is withdrawn from Congressional consideration, the defendant, Clyde L. Miller, as Secretary of State of Utah, will be subject to the Order of this Court requiring him to advise the Congress of the United States that said Resolution is invalid and of no force or effect as an application to Congress under Article V, Constitution of the United States, and to request the prompt return of said Resolution.

## PROPOSED CONVENTION ON APPORTIONMENT AMENDMENT

S.J.R. No. 3

(Passed January 28, 1965)

A Joint Resolution of the Senate and House of Representatives of the Thirty-sixth Legislature of the State of Utah Applying to Congress of the United States to Call a Convention for the Purpose of Proposing an Amendment to the Constitution of the United States to Provide for Apportioning the Membership of One House of a Bicameral Legislature on Factors Other Than Population.

*Be it resolved by the Legislature of the State of Utah:*

WHEREAS, the Supreme Court of the United States has ruled that membership in both houses of a bicameral state legislature must be apportioned according to population and has thus asserted federal judicial authority over the basic structure of government in the various states; and

WHEREAS, this rule denies to the people of the respective states the right to establish their legislatures upon the same pattern of representation deemed advantageous for the Congress of the

United States and provided by the Federal Constitution; and

WHEREAS, this action of the Supreme Court goes so far as to restrict the ability of the citizens of the respective states to designate the manner in which they shall be represented in their respective legislatures thereby depriving the people of their right to determine how they shall be governed; and

WHEREAS, the implications of this action by the Supreme Court raise serious doubts as to the legality of the present form of the governing bodies of many subordinate units of government within the states;

NOW, THEREFORE, BE IT RESOLVED BY THE SENATE AND HOUSE OF REPRESENTATIVES OF THE THIRTY-SIXTH LEGISLATURE OF THE STATE OF UTAH that this Legislature respectfully applies to the Congress of the United States to call a convention for the purpose of proposing the following article as an amendment to the Constitution of the United States.

"ARTICLE . . ."

"Section 1. Nothing in this Constitution shall prohibit any state which shall have a bicameral legislature from apportioning the membership of one house of such legislature on factors other than population, provided that the plan of such apportionment shall have been submitted to and approved by a vote of the electorate of that state.

Section 2. Nothing in this Constitution shall restrict or limit a state in its determination of how membership of governing bodies of its subordinate units shall be apportioned.

Section 3. This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of three-fourths of the several States within seven years from the date of its submission to the States by the Congress."

BE IT FURTHER RESOLVED that when and if Congress shall have proposed such an article of Amendment this application for a convention shall no longer be of any force or effect.

BE IT FURTHER RESOLVED that the proper officer of this State be and he hereby is directed to transmit copies of this application to the Senate and House of Representatives of the United States, and to the several members of said bodies representing this State therein; also to transmit copies hereof to the Legislatures of all other States of the United States.

### JUDGMENT BY THE COURT AND PERMANENT INJUNCTION ORDER

The Court, having heard final argument in the above-entitled matter and having filed its Findings of Fact and Conclusions of Law herein, enters the following Judgment and Order:

1. S.J.R. No. 3, adopted by the 1965 Utah State Legislature on January 28, 1965, is determined by this Court and hereby declared to be invalid and of no force or effect as an application to Congress under Article V, Constitution of the United States.

2. The defendant Clyde L. Miller, Secretary of State of Utah, is enjoined and commanded by the Order of this Court to advise the Congress of the United States that S.J.R. No. 3, adopted by the 1965 Utah Legislature, has been determined by this Court to be invalid and of no force or effect as an application to Congress under Article V, Constitution of the United States and to request the prompt return of said Resolution.

3. A copy of this Order and Judgment shall be personally served upon the defendant Clyde L. Miller, Secretary of State of Utah, by the United States Marshal and said Order should be effective from and after 12 o'clock noon, October 10, 1969.